**STATE of Alaska, Appellant,**

v.

**Susan H. ABBOTT, Guardian of Brenda Vogt, a minor, Appellee.**

**Susan H. ABBOTT, Guardian of Brenda Vogt, a minor, Cross-Appellant,**

v.

**STATE of Alaska, Cross-Appellee.**

**Nos. 1463, 1467.**

Supreme Court of Alaska.

June 16, 1972.

---

1. Civ.R. 12(b).

2. Civ.R. 56(c).

Charles Hagans and Keith E. Brown, Sanford M. Gibbs, Asst. Atty. Gen., Anchorage, for State of Alaska.

William H. Fuld and Bernard P. Kelly, of Kay, Miller, Libbey, Kelly, Christie & Fuld, Anchorage, for Susan H. Abbott.

Before BONEY, C. J., and RABINO-WITZ, CONNOR and ERWIN, JJ.

## OPINION

ERWIN, Justice.

On Sunday, January 22, 1967, Brenda Vogt, then 13½ years old, was a passenger in the front seat of a 1967 Pontiac driven by her mother, Delores Vogt, in a southerly direction on the Seward Highway. While attempting to negotiate the curve near Girdwood at Mile 90.8 of the highway, one-half mile north of the Alyeska turnoff, Mrs. Vogt lost control of her vehicle which skidded across the center line and collided with an Army National Guard truck that was part of a convoy headed north towards Anchorage. Brenda Vogt was thrown into and partly through the windshield. She remained unconscious for a period of three weeks and suffered extensive permanent injuries, including severe brain damage.

Brenda Vogt, acting through her guardian, brought suit against the state under AS 09.50.250 alleging that the state had been negligent in its design, construction and maintenance of the road and in failing to post signs warning of the hazardous condition of the curve. Pursuant to AS 09.-50.290 trial was had before a superior court judge sitting without a jury.

Although Brenda Vogt settled a separate negligence claim against her mother out of court prior to trial, considerable testimony was offered concerning Mrs. Vogt's operation of the vehicle to determine the cause of the accident. Estimates of her speed by various witnesses ranged from 30 to 50 miles per hour and a number of witnesses stated that the vehicle was moving too fast for the road conditions. The sharp curve in the road where the accident occurred was clearly visible because of the long straight stretch north of it and because the National Guard convoy was stretched out over a considerable distance, thereby tending to outline its shape. Mrs. Vogt had driven over the road a number of times and was generally familiar with it, but apparently had not made the trip in winter. As will appear below, however, Mrs. Vogt's negligence is not determinative of the state's liability to Brenda Vogt.

Regarding the condition of the highway, testimony was offered that the road was covered with ice and very slippery, but conflicting evidence was presented as to whether it had been adequately sanded. Several witnesses testified that the ice on the highway was rutted from the state's maintenance procedures and that the rut-

ting would cause a car to swerve at certain speeds. There was also testimony that the superelevation—the vertical distance between the inside and outside edges of the curve—undulated through the turn as a result of faulty maintenance. There had been a number of similar accidents at the same curve, and several state troopers testified that they had had trouble negotiating the curve. The state had been given notice of these problems.

The state produced evidence that tended to show that it had followed its usual maintenance practices. Brenda Vogt, however, introduced into evidence the state's S.O.P.s (Standard Operating Procedures) for highway maintenance which require the Department of Highways to (1) maintain superelevations on curves, (2) eliminate ruts prior to freezeups, and (3) work overtime if necessary to keep sharp curves well sanded. Testimony was presented which tended to show that the state had not complied with these S.O.P.s.

At the conclusion of the trial the superior court judge filed an opinion setting out his findings of fact and conclusions of law as required by Civil Rule 52(a). The judge found that the curve was "extremely slippery" and that, although the road had probably been sanded on the morning of the accident, "there was very little, if any sand on the traveled portion of the highway immediately after the collision." The judge stated:

I find specifically that under the conditions existing with a slick Highway and rutted ice that whatever sanding had been done was not adequate, and that the State of Alaska, through its employees, did not act as reasonable persons would have acted in properly sanding or salting or otherwise doing something with reference to this curve to make it reasonably safe for travel by the general public. In other words, I find that the State of Alaska, through its agents, was negligent at the time and place in question with reference to the maintenance of this particular curve.

The judge ruled that the state was not negligent in its design and construction of the curve, and that the failure to post adequate signs warning of the dangerous curve was not a proximate cause of the accident.

The judge found that the state had notice of the dangerous conditions at the curve and that its negligence, combined with the concurrent negligence of Mrs. Vogt, proximately caused Brenda Vogt's injuries.

I find that the State of Alaska, through its highway maintenance section, for a considerable time prior to the collision here concerned, had full knowledge of the dangerous condition of the particular curve involved. I find that under the circumstances existing, known to the State of Alaska, that the State of Alaska failed to use reasonable and ordinary care in correcting a known hazard and to properly maintain the Highway, for safe travel by the public, at the place involved in the collision here concerned.

Accordingly, I find that the State of Alaska was negligent and that such negligence was a proximate cause of the collision which occurred between the Vogt vehicle and the Army National Guard truck. Furthermore, I find that the negligence of the State, as herein outlined, combined with negligence of Delorise [sic] Vogt, proximately caused the collision and the resulting injuries to the girl Brenda Vogt.

He concluded that the acts of the state were not within the discretionary function exception to the waiver of sovereign immunity contained in AS 09.50.250.

The court held that Brenda was damaged to the extent of $266,000. Since Brenda had previously settled out of court with Mrs. Vogt for $50,000, judgment against the state was entered for $216,000.

On appeal the state raises five basic arguments: (1) The determination of what constitutes proper winter maintenance of the state's highway system is a "discretionary function" within the meaning of AS 09.50.250 for which the state is not liable. (2) To hold the state liable for

injuries resulting from the natural accumulation of ice and snow on the state's highways would impose an excessive burden on the state. (3) The trial judge's finding that the state's negligence was a proximate cause of the accident is clearly erroneous. (4) The trial judge's findings of fact regarding the condition of the traveled portion of the highway are clearly erroneous. (5) The lower court's memorandum opinion does not contain adequate findings of fact under Civil Rule 52(a) as to Delores Vogt's negligence. In addition, Brenda Vogt filed a cross-appeal challenging as inadequate the court's award of damages and attorney's fees.

We have concluded that the lower court's decision should be affirmed in all respects except for the award of damages. We vacate that award and remand to enable the trial judge to make further findings of fact so as to comply with Civil Rule 52(a).

I

■■■■ The state argues that the determination of what constitutes proper winter maintenance of the state's highway system is a "discretionary function" of the state highway department within the meaning of AS 09.50.250 for which no action will lie. AS 09.50.250 provides in part:

A person or corporation having a claim against the state may bring an action against the state in the superior court. However, no action may be brought under this section if the claim (1) . . .

[is] based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused.

Although there are no Alaska cases interpreting the discretionary function exception to the waiver of sovereign immunity,[1] the critical statutory language is identical to that contained in the Federal Tort Claims Act, 28 U.S.C.A. § 2680(a), and there exists an abundance of relevant[2] federal case law.

The doctrine of sovereign immunity, which sprang from the ancient maxim that the King can do no wrong,[3] has been strongly criticized in legal literature and variously described as a "medieval doctrine",[4] "mistaken and unjust"[5] and "an anachronism, without rational basis, [that] has existed only by the force of inertia."[6] Although the Federal Tort Claims Act of 1946, which provides in part that "[t]he United States shall be liable [in tort] in the same manner and to the same extent as a private individual under like circumstances . . .,"[7] was heralded as a comprehensive waiver of governmental immunity, the exception for discretionary functions has been read so broadly on occasion, most notably in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), as to almost reinstate complete immunity. In Dalehite, which arose out of the Texas City disaster of

1. Sisley v. United States, 202 F.Supp. 273 (D.Alaska 1962), is a federal case dealing with the liability of the United States under the Federal Tort Claims Act. In City of Fairbanks v. Schaible, 375 P.2d 201, 206–209 (Alaska 1962), this court refused to give effect to the related doctrine that a municipal corporation could not be held liable in tort for "governmental" as opposed to "proprietary" functions.

2. See Cesar v. Alaska Workmen's Compensation Board, 383 P.2d 805, 807 (Alaska 1963), where we noted that we would consider federal precedents when a state statute closely resembles a federal statute.

3. For an excellent discussion of the historic roots of the sovereign immunity doctrine see Muskopf v. Corning Hospital District, 55 Cal.2d 211, 11 Cal.Rptr. 89, 90–91, 359 P.2d 457, 458–459 (1961) (Traynor, J.).

4. Greenhill & Murto, Governmental Immunity, 49 Tex.L.Rev. 462, 465 (1971).

5. Muskopf v. Corning Hosp. Dist., 55 Cal. 2d 211, 11 Cal.Rptr. 89, 90, 359 P.2d 457, 458 (1961) (Traynor, J.).

6. Id. 11 Cal.Rptr. at 92, at 460.

7. 28 U.S.C.A. § 2674.

1947, the Supreme Court held that the federal government's decision to conduct a fertilizer export program without testing the explosiveness of the ammonium nitrate contained in the fertilizer was within the discretionary function exception. Although the court declined to specify where the discretion concept ended, it held that it included more than the mere initiation of programs:

> It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. *Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.* (emphasis added) (footnote omitted)

346 U.S. 35–36, 73 S.Ct. at 968, 97 L.Ed. 1440–1441. The state relies strongly on the emphasized language and argues that the allocation of maintenance equipment and personnel to the Girdwood area was a discretionary decision of a highway department subordinate and thus within the exception.

We have concluded, however, that the state's reliance on *Dalehite* is misplaced. First, the language in *Dalehite* that has been given greatest emphasis in subsequent decisions [8] is not the language quoted above but rather the following dictum:

> In short, the alleged 'negligence' does not subject the government to liability. The decisions held culpable were all responsibly *made at a planning rather than operational level* . . . . (emphasis added)

346 U.S. 42, 73 S.Ct. 971, 97 L.Ed. 1444. As will appear below, proper application of the planning-operational distinction defeats the state's claim of immunity.

Moreover, in light of the almost unanimous adverse reaction of the legal commentators to *Dalehite* and because of the limitations placed on the decision by subsequent cases, *Dalehite* is now of questionable authority.[9] Indeed, due to the widespread belief that the *Dalehite* majority carried the exception too far, Justice Jackson's dissenting opinion is quoted as often as the majority opinion.[10] Justice Jackson conceded that there were many *policy* decisions of a regulatory or governmental nature which should properly be "controlled solely by the statutory or administrative mandate and not by the added threat of private damage suits."[11] The acts complained of in *Dalehite*, however, were not in that category, he argued; rather, they dealt with the "housekeeping" side of federal activities. In that area

> there is no good reason to stretch the legislative text to immunize the Government or its officers from responsibility for their acts, if done without appropriate care for the safety of others. Many official decisions even in this area may involve a nice balancing of various considerations, but this is the same kind of balancing which citizens do at their peril and we think it is not within the exception of the statute.

346 U.S. 60, 73 S.Ct. 980, 97 L.Ed. 1453.

Subsequently, in Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Court moved away from the *Dalehite* majority's restrictive interpretation of the Federal Tort Claims Act's waiver of sovereign immunity and toward Justice Jackson's position. Indian Towing sought recovery for damages caused by the allegedly negligent failure of the Coast Guard to keep a light-

---

8. *E. g.*, Rogers v. State, 51 Haw. 293, 459 P.2d 378, 381 (1969). *See* Reynolds, The Discretionary Function Exception of the Federal Tort Claims Act, 57 Geo.L.J. 81, 103–107 (1968).

9. *See* Reynolds, note 8 *supra* at 106–111, 126 (1968). *See also* Peck, The Federal Tort Claims Act: A Proposed Construction of the Discretionary Function Exception, 31 Wash.L.Rev. 207, 217 (1956).

10. Reynolds, note 8 *supra* at 95.

11. 346 U.S. at 59, 73 S.Ct. at 980, 97 L.Ed. at 1453.

house in operating order. The Court stated that the alleged negligence occurred at the "operational" level and involved no "discretion" within the meaning of the act.[12] It firmly rejected the government's argument that no liability would exist for the negligent performance of "uniquely governmental functions" and adopted the "good Samaritan" rule: the Coast Guard was not obligated to operate the lighthouse, but having exercised its discretion to do so a duty to exercise due care arose.[13] *Indian Towing* is significant for its broad reading of the Federal Tort Claims Act. In addition, the Court's adoption of the rule that once discretion is exercised to undertake an activity a duty of reasonable care attaches in its performance obviously limits the language in *Dalehite* that immunity extends to subordinates executing policies formulated by officials exercising discretion.[14]

Similarly, although Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), did not clarify the scope of the discretionary function exception, the case is notable both for its reaffirmation of *Indian Towing* and for a liberal attitude toward the Act that seems at odds with the *Dalehite* majority's approach. In holding that a property owner could recover for the negligence of the United States Forest Service in fighting a forest fire, the Court stated that the Act was founded on the premise that it is preferable to spread the cost of governmental negligence among all those who contribute financially to the government rather than allow the entire risk to fall on the injured party.[15]

Further, in Eastern Air Lines, Inc. v. Union Trust Co., 95 U.S.App.D.C. 189, 221

F.2d 62, aff'd. per curiam, United States v. Union Trust Co., 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955), the circuit court held that air traffic controllers were not performing a "discretionary function" within the meaning of the Act when two airplanes were cleared for landing on the same runway at approximately the same time. The court distinguished between non-actionable planning and actionable negligence in carrying out the plan stating:

> [D]iscretion was exercised when it was decided to operate the tower, but the tower personnel had no discretion to operate it negligently.

221 F.2d at 77. The Supreme Court summarily affirmed citing *Indian Towing*. Professor Reynolds argues that the Supreme Court's disposition of the case indicates "that *Dalehite* survives, if at all, only in its belief that discretion was involved in each act, not in its indication that discretion 'carries over' into performance." [16]

In light of the questionable status of *Dalehite*, it is hardly surprising that the lower federal courts have not treated discretionary function problems consistently. Professor Reynolds points out, however, that the post-*Dalehite* federal decisions have generally followed one of three approaches.[17] First, some courts have followed the rule suggested by the *Dalehite* dictum that planning level decisions fall within the exception while operational ones do not. These courts have tended to read the exception much more narrowly than *Dalehite*, however.[18] Second, other courts have focused upon the "good Samaritan" rule of *Indian Towing* holding that once discretion is exercised to do a particular act, the act must be performed with rea-

---

12. 350 U.S. at 64, 76 S.Ct. 122, 100 L.Ed. at 53.

13. *Id.* at 69, 76 S.Ct. 122, 100 L.Ed. at 56.

14. *See* Reynolds, note 8 *supra* at 99–103.

15. 352 U.S. at 319–320, 77 S.Ct. 374, 1 L.Ed.2d at 358 (1957).

16. Reynolds, note 8 *supra* at 104.

17. Reynolds, note 8 *supra* at 103–110.

18. *E. g.*, American Exch. Bank v. United States, 257 F.2d 938 (7th Cir. 1968); Eastern Air Lines, Inc. v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62, aff'd per curiam 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955).

sonable care.[19] These two analytic approaches are closely related and will lead to the same result in most cases.[20] Finally, consonant with the majority position in *Dalehite*, some courts have simply read "discretionary function" very broadly so as to include more than just planning and policy decisions.[21]

Most of the extensive law review literature on the discretionary function exception has been critical of *Dalehite* and has supported some combination of the first two approaches described above. Thus, one article described the proper operation of the exception as follows:

> Immunity remains if the injury results from a deliberate choice in the formulation of policy. If the injury results from negligent execution of the policy, then the act is ministerial and liability ensues.[22]

A number of cases have utilized a similar approach. Thus, in Swanson v. United States, 229 F.Supp. 217, 220 (N.D.Cal.1964), the court stated:

> The planning level notion refers to decisions involving questions of policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy. . . .
>
> The operations level decision, on the other hand, involves decisions relating to the normal day-by-day operations of the government.[23]

Similarly, in California, whose state tort claim's act, like Alaska's, is modeled on the Federal Tort Claims Act, the state supreme court has interpreted "discretionary" acts to include only those made at the planning level, while decisions made at the operational or ministerial level are actionable.[24] Several of the California decisions are particularly instructive and deserving of further discussion.

In Muskopf v. Corning Hospital District, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961), decided prior to California's enactment of its tort claims act, Justice Traynor, with characteristic acumen, explored the common law roots of the sovereign immunity doctrine, noted the many exceptions to the rule, and concluded that the doctrine has no modern-day justification. The basic policy of the law should be that "when there is negligence, the rule is liability, immunity is the exception." [25]

Subsequently, in Johnson v. State, 69 Cal. 2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968), the California court faced the problem whether the failure of a parole officer to warn foster parents of the dangerous propensities of a youth being placed in their home was a "discretionary" act within the meaning of the statute. The court noted that almost any act, even driving a nail, involves *some* "discretion" and refused to be limited to a simply semantic inquiry into the meaning of the word. Instead, it focused on the policy behind the discretionary immunity doctrine for guidance in determining whether a given act was discretionary or ministerial.

19. *E. g.*, United States v. Lawter, 219 F.2d 559 (5th Cir. 1955); Fair v. United States, 234 F.2d 288 (5th Cir. 1956).

20. This similarity is illustrated by *Eastern Air Lines* where the court of appeals held the government liable using a planning-operational rationale and the Supreme Court summarily affirmed citing *Indian Towing*. See discussion of *Eastern Air Lines* at page 12, *supra*.

21. *E. g.*, Harris v. United States, 205 F.2d 765 (10th Cir. 1953); Goddard v. District of Columbia Redev. Land Agency, 109 U.S.App.D.C. 304, 287 F.2d 343 (1961).

22. Greenhill & Murto, Governmental Immunity, 49 Tex.L.Rev. 462, 472 (1971). *See also* Reynolds, note 8 *supra* at 128–132; Note, The Discretionary Exception and Municipal Tort Liability: A Reappraisal, 52 Minn.L.Rev. 1047, 1060–64 (1968).

23. *See also* United Airlines, Inc. v. Wiener, 335 F.2d 379, 393 (9th Cir.), cert. dismissed 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964); Harrigan v. City of Reno, 86 Nev. 678, 475 P.2d 94, 95–96 (1970).

24. *See* W. Prosser, Torts § 131 at 987 (4th ed. 1971).

25. 11 Cal.Rptr. at 94, 359 P.2d at 462.

In drawing the line between the immune 'discretionary' decision and the unprotected ministerial act we recognize both the difficulty and the limited function of such distinction. As we said in Lipman v. Brisbane Elementary School Dist., supra, 55 Cal.2d 224, 230, 11 Cal.Rptr. 97, 99, 359 P.2d 465, 467, 'it may not be possible to set forth a definite rule which would determine in every instance whether a governmental agency is liable.' A workable definition nevertheless will be one that recognizes that '[m]uch of what is done by officers and employees of the government must remain beyond the range of judicial inquiry' (3 Davis, Administrative Law Treatise (1958) § 25.11, p. 484); obviously 'it is not a tort for government to govern' (Dalehite v. United States (1953) 346 U.S. 15, 57, 73 S.Ct. 956, 979, 97 L.Ed. 1427 (Jackson, J., dissenting)). Courts and commentators have therefore centered their attention on an assurance of judicial abstention in areas in which the responsibility for *basic policy decisions* has been committed to coordinate branches of government. Any wider judicial review, we believe, would place the court in the unseemly position of determining the propriety of decisions expressly entrusted to a coordinate branch of government. Moreover, the potentiality of such review might even in the first instance affect the coordinate body's decision-making process. . . . (emphasis in original)

73 Cal.Rptr. at 248, 447 P.2d at 360. The California court, noting that its proposed distinction is sometimes described as that between "planning" and "operational" levels of decision-making, conceded that application of its test in individual cases would entail delicate judgment:

[T]he very process of ascertaining whether an official determination rises to the level of insulation from judicial review requires sensitivity to the considerations that enter into it and an appreciation of the limitations on the court's ability to reexamine it.

73 Cal.Rptr. at 248, 447 P.2d at 360. Since this approach [26] has the analytic virtue of focusing on the reasons for granting immunity to the governmental entity, however, we are persuaded that it is a well-reasoned approach to the problem.

Other authorities have utilized similar analysis. In Rogers v. State, 51 Haw. 293, 459 P.2d 378, 381 (1969), for example, the court held that such matters as the placing of road signs and center line stripes "did not require evaluation of policies but involved implementation of decisions made in everyday operation of governmental affairs" for which liability would attach.[27] Analogously, Professor Reynolds argues that the planning-operational distinction adequately serves what he regards as the main purposes of the discretionary function exception: (1) the need to preserve separation of powers by limiting judicial reexamination of decisions made by the other branches of government; (2) the fact that courts are not equipped to investigate and balance all the factors that go into an executive or legislative decision; (3) the public interest in preventing the enormous and unpredictable liability that would result from

---

**26.** *See* Elton v. County of Orange, 3 Cal. App.3d 1053, 84 Cal.Rptr. 27 (1970) for a subsequent California case using the same mode of analysis.

**27.** The distinction between planning and operational functions as applied to highway design and maintenance can be illustrated by comparing Sisley v. United States, 202 F.Supp. 273 (D.Alaska 1962), with Rodrigues v. State, 472 P.2d 509 (Hawaii 1970). In *Sisley* the court held that culvert *design* was a planning function and

within the discretionary function exception to the Federal Tort Claims Act. In *Rodrigues* the court distinguished *Sisley*, holding that since the alleged negligence was in the state's *maintenance* of the culvert, not in culvert *design*, the acts were not within the exception. *But see* Baldwin v. State, 6 Cal.3d 424, 99 Cal.Rptr. 145, 491 P.2d 1121 (1972), holding that design immunity is not perpetual but evaporates after the governmental entity receives notice that due to changed circumstances a dangerous condition exists.

judicial reexamination of the decisions of the other branches of government.[28]

Turning then to the specific circumstances of this case, the lower court found the state and its employees negligent in failing to exercise reasonable care to maintain the curve where the accident occurred. We have concluded that the trial court was correct in holding that such maintenance was not within the discretionary function exception. Although it is true, as the state contends, that the district engineer's decision as to how many men and how much equipment were necessary to maintain this particular stretch of highway involved a certain amount of planning and discretion, it is not the kind of broad policy decision at which the exception, as interpreted by the above authorities, is aimed. Once the initial policy determination is made to maintain the highway through the winter by salting, sanding and plowing it, the individual district engineer's decisions as to how that decision should be carried out in terms of men and machinery is made at the operational level; it merely implements the basic policy decision. Once the basic decision to maintain the highway in a safe condition throughout the winter is reached, the state should not be given discretion to do so negligently.[29] The decisions at issue in this case simply do not rise to the level of governmental policy decisions calling for judicial restraint.[30] Under these circumstances the discretionary function exception has no proper application.

28. Reynolds, note 8 *supra* at 121–23, 128–31. *See also* Note, 41 Wash.L.Rev. 340, 344 (1966); Smith v. United States, 375 F.2d 243, 248 (5th Cir.), cert. denied 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967).

29. This application of the rule is consistent with the better reasoned federal cases as summarized by the court in United Airlines, Inc. v. Wiener, 335 F.2d 379, 393 (9th Cir.), cert. dismissed 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964):

> Discretionary to undertake fire-fighting, light-house, rescue, or wrecked-ship marking services, but not discretionary to conduct such operations negligently, discretionary to admit a patient to an Army hospital, but not discretionary to treat the patient in a negligent manner; discretionary to establish a post office at a particular location, but not to negligently fail to establish handrails; discretionary to establish control towers at airports and to undertake air traffic separation, but not to conduct the same negligently; discretionary to reactivate an air base, but not to construct a drainage and disposal system thereon in a negligent fashion: and discretionary for CAA to conduct a survey in low flying, twin engine airplane, but not for pilot thereof to fly negligently. (footnotes omitted)

*See also* W. Prosser, Torts § 131 (4th ed. 1971).

30. Our conclusion that the basic policy decision had already been made is buttressed by the fact that the state had drawn up detailed S.O.P.s outlining maintenance procedures throughout the state. Failure to comply with the S.O.P.s would seem to be operational negligence rather than policy-making discretion. S.O.P. 4301–06, page 13 of 13, for example, provides in part:

> Sanding crews must be dispatched at the first indication that traffic is having difficulty, with particular attention given to intersections and grades. Maintenance crews in outlying areas must keep steep grades and sharp curves well sanded, working overtime and at night if conditions warrant. Maintenance foremen must be alert to this condition and plan accordingly, and employees should be instructed to report for duty when inclement weather threatens. Sanding operations must continue as long as conditions warrant. First, priorities should be given to hills, intersections and curves.

Although the S.O.P. quoted above did not become effective until February 1, 1967, nine days after the date of the accident, there is no indication in the record that the portion quoted was any different than the superseded S.O.P. which had been promulgated four years earlier. Consequently, we feel that Brenda Vogt's characterization is accurate:

> The policy decision that the state should maintain a reasonably safe highway had already been made; the negligence alleged in this case is in the failure to effectuate that policy in the most rudimentary ways.

## II

■ The state next argues that it is not liable for injuries which result from the natural accumulation of ice and snow on state highways. It relies on Hale v. City of Anchorage, 389 P.2d 434 (Alaska 1964), which held that the City of Anchorage was not liable for injuries sustained by persons as a result of naturally accumulated ice and snow on the city's sidewalks. The state reasons that "[t]o impose liability upon the State of Alaska for failure to properly sand its highways as the trial court did in this case, is to place an impossible burden upon the State of Alaska. Alaska's climatic extremes, the vast distances covered by its highways, and its low population base, makes the State's maintenance duties extremely arduous."

We think the appropriate analytic starting point is not *Hale*, as the state suggests, but rather State v. Phillips, 470 P.2d 266 (Alaska 1970). In *Phillips*, this court, under the clearly erroneous test prescribed by Civil Rule 52(a), upheld the trial court's finding that the state had been negligent in failing to take reasonable precautions to protect highway users from the danger caused by extensive rutting in the ice on the

Seward Highway after it had been given actual notice that the rutting was causing vehicles to lose control. This court noted:

> Review of the evidence in the case at bar also leads to the conclusion that the State of Alaska had prior notice of the dangerously defective condition of the Seward Highway in the location of Phillips' accident; that the state failed to undertake appropriate reasonable measures to alleviate existing dangerous conditions; that the state's failure in this regard constituted a breach of the duty of care it owed to decedent . . .; and that this breach was the proximate cause of the fatal accident.

470 P.2d at 270.

In light of *Phillips*, it is clear that *Hale* cannot be read to preclude liability in suits brought against the state for negligent winter highway maintenance.[31] Although this court in *Phillips* did not elaborate on the standard of care owed by the state for highday maintenance in general, the opinion does indicate that in at least some circumstances the state will be held liable for dangerous highway conditions caused by ice and snow accumulation. While *Phillips* is adequate authority for upholding the trial court's decision in the instant case,[32] we

31. *Hale* is not necessarily inconsistent with either *Phillips* or our opinion in the case at bar. In *Hale* this court was influenced not only by what it termed the "impossible burden" of clearing all the city's sidewalks of ice and snow, but also by the belief that snow removal activities probably would make the sidewalks more dangerous:

> [W]e know from the evidence, and also from our own experience, that the most diligent effort to clean off such an area would leave a smooth surface of ice, more dangerous than the original condition because of the sloping sidewalk caused by the curbcut and because of the removal of the uneven surfaces of ice that could provide footing.

389 P.2d 434, 437. *See also* Kremer v. Carr's Food Center, Inc., 462 P.2d 747, 751 (Alaska 1969). In contrast, there is no reason to believe that proper maintenance of state highways would fail to make them reasonably safe for travel or that such maintenance would render

highways more dangerous. The risks attendant to travel by automobile on an ice-covered highway are of a different order than those accompanying pedestrian traffic on an icy sidewalk. However, we need not now determine *Hale's* continued validity, but leave that question to future adjudication.

32. The case at bar is similar to *Phillips* in a number of particulars. First, as in *Phillips*, there was extensive rutting in the road which the trial court found had contributed to the accident. The lower court "[found] specifically that under the conditions existing with a slick Highway and rutted ice that whatever sanding had been done was not adequate, and that the State of Alaska, through its employees, did not act as reasonable persons would have acted . . . ."

In explaining his findings, Judge Davis said:

> Also the defendants here have overlooked the fact, I think, that the claim was

deem it appropriate to consider here the larger issue as to what duty of care the State of Alaska owes to persons using its highways in general.

Title 19 of the Alaska statutes, which deals with the state's highway system, provides that the Department of Highways is responsible for highway maintenance but fails to specify what standard shall be used to measure performance of that duty.[33] For a number of reasons we have concluded that the scope of the state's duty should be defined by ordinary negligence principles.

First, although AS 09.50.250 places a number of limitations on the state's liability,[34] it contains no indication that the legislature intended that the state should be held to a lesser standard of care than private individuals. It provides simply that a "person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state in the superior court." The following statement by the United States Supreme Court in refusing to read into the federal statute any limitations not expressly provided for, would seem equally applicable here:

> Congress was aware that when losses caused by such negligence are charged against the public treasury they are in effect spread among all those who contribute financially to the support of the Government and the resulting burden on each taxpayer is relatively slight. But when the entire burden falls on the injured party it may leave him destitute or grievously harmed. Congress could, and apparently did, decide that this would be unfair when the public as a whole benefits from the services performed by Government employees.[35]

The Alaska legislature, in enacting AS 09.50.250, adopted the same risk-spreading principle. It seems to us that to impose a lesser standard of care upon the state for highway maintenance would substantially diminish the risk-spreading effects of AS 09.50.250 and seriously undermine the sound policy consideration upon which it is based.[36]

Further, we are not persuaded by the state's argument that to impose liability on the state for its negligent failure to maintain our highways through the winter would place an "impossible burden" on the state. As Professor Van Alstyne notes:

> The fear that large unanticipated impositions upon public funds will be required

made and not disputed anywhere that the ice was not only slick but was rutted at the time and place in question. All this went into the matter of a very very hazardous condition.

There was testimony below that the rutting was caused by the state's maintenance procedures and that the ruts tended to induce lateral skidding. In addition, the trial judge found that the highway department had notice of the dangerous condition of the curve. There had been a number of accidents at the curve in the past several years and a number of complaints from the State Troopers. Thus, like *Phillips*, there was a particular "non-natural" hazard of which the state had notice.

33. AS 19.05.010 provides:
   The [Department of Highways] is responsible for the planning, construction, maintenance, protection and control of the state highway system.
   AS 19.05.030 provides in part:
   The [Department of Highways] has the following duties:

(1) direct approved highway planning and construction and maintenance, protection and control of highways . . .

34. That section provides that no action may be brought for an act or omission of an employee using due care in executing a statute or regulation or for the performance or non-performance of a discretionary function. AS 09.50.250(1). The statute also prohibits recovery for various intentional torts, AS 09.50.250(3), and provides that no punitive damages may be recovered. AS 09.50.280.

35. Rayonier, Inc. v. United States, 352 U.S. 315, 320, 77 S.Ct. 374, 377, 1 L.Ed. 2d 354, 358 (1957).

36. *See* Van Alstyne, Governmental Tort Liability: A Decade of Change, 1966 U. Ill.L.F. 919, 921 (1966); Note, the Discretionary Exception and Municipal Tort Liability: A Reappraisal, 52 Minn.L. Rev. 1047, 1057 (1966).

to satisfy tort damage claims is exaggerated; the ready availability of liability insurance provides adequate protection at moderate cost which may be budgeted in advance. Private corporate enterprises with substantial potential risk exposures have managed to bear the burdens of general tort liabilities without observable detriment to operational success, and there is little reason to believe that public entities would not do likewise.[37]

While the negligence standard satisfies the strong public policy favoring compensation of individuals injured by the tortious conduct of the state, it is an extremely flexible standard, and consequently will not inhibit the vigorous and effective performance by the state of its duties in the way that a more rigid standard might. Moreover, when the negligence standard is applied in conjunction with the policy-oriented interpretation of the discretionary function exception outlined in the previous section, the danger of excessive judicial interference with important decisions committed to the coordinate branches of government is avoided.

The flexible operation of the negligence standard is easily illustrated. Dean Prosser states the elements of a cause of action for negligence to be:

1. A *duty* . . . requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks.

2. A failure on his part to conform to the standard required. . . .

3. A reasonable close causal connection between the conduct and the resulting injury. . . . [proximate cause]

4. Actual loss or damage resulting to the interests of another. . . .[38]

In order for a plaintiff to show that the state exposed him to an *unreasonable* risk of harm he would have to demonstrate that the likelihood and gravity of the harm threatened outweighed the utility of the state's conduct and the burden on the state for removing the danger.[39] In making that determination in the case at bar, all of the following factors would be relevant: whether the state had notice of the dangerous condition, the length of time the ice and snow had been on the highway, the availability of men and equipment, and the amount of traffic on the highway. Similarly, the traditional proximate cause foreseeability requirement, in conjunction with the other elements of a negligence cause of action, will operate to prevent the imposition of an excessive burden on the state. This consideration was clearly articulated in a recent law review note:

[A]s risks shift from the speculative to the certain, they become increasingly susceptible to reasoned evaluation. In this situation, it is possible for the officer to weigh the risk along with the other factors involved in a particular decision. To require that they do so, just as a private individual must with respect to possible tortious acts, would seem to be a desirable result and would encourage the making of decisions which do not impose unnecessary costs on society as a whole. Moreover, it does not require officials to do that which is impossible and thus does not constitute unreasonable interference with the decision making process. In addition, the government will, presumably, have been aware of the foreseeable potential loss when it undertook to act and the imposition of liability will neither interfere with the original decision nor operate to defeat the decision maker's

---

37. Van Alstyne, note 36 *supra* at 921.

38. W. Prosser, Torts § 30 at 143 (4th Ed. 1971).

39. *See generally id.* §§ 31–33 at 145–180. The fact that the Department of Highways has already adopted S.O.P.s designed to "provide highway users with a safe, well kept highway" (S.O.P. 4001–01, page

1 of 2), and which outline sanding and snow removal procedures and which require the snow removal crews to work "continuously throughout the storm" (S.O.P. 4301–06, page 1 of 13), and "overtime and at night if conditions warrant" (S.O.P. 4301–06, page 13 of 13), is a strong indication that this burden is not excessive.

reasonable expectations. By thus applying traditional concepts of tort liability, the administration is not being told that it may not make a particular decision and act pursuant thereto. It is merely being made to pay the entire foreseeable costs of its activities.[40]

Our holding that the state is obligated to exercise reasonable care is in line with the better-reasoned decisions in other jurisdictions. The Second Restatement of Torts § 349, comment b (1965), for example, refers to the duty to maintain a highway safe for travel as including

> not only a duty to maintain the surface of the highway in a condition reasonably safe for travel, but also a duty of warning the travelling public of any other condition which endangers travel, whether caused by a force of nature, such as snow or ice, or by the act of third persons, such as a ditch dug in the sidewalk or roadway or an obstruction placed upon it.

Other jurisdictions, while acknowledging that the state is not an insurer of the safety of motorists, recognize the duty of highway authorities to exercise reasonable care to keep the highway in a safe condition.[41]

The court below applied the correct legal standard to measure the state's conduct. In applying the negligence standard to the facts of this case, as will appear in the next section, we have concluded that the trial judge was clearly justified in concluding that the state breached its duty of reasonable care to Brenda Vogt and that this breach was a proximate cause of her injuries.[42]

### III

We turn next to the state's argument that the trial court erred in finding that Brenda Vogt's injuries were proximately caused by the negligent acts of the state.

■■ In City of Fairbanks v. Nesbett, 432 P.2d 607 (Alaska 1967), this court held that it was proper to find that a defendant's negligent conduct was the "legal cause" of plaintiff's injury if the negligent act "was more likely than not a substantial factor in bringing about [plaintiff's] injury."[43] The court stated further:

> It is not necessary for the actor's conduct to be 'the' legal cause of an injury for liability to attach to the actor. It is only necessary that such conduct be 'a' legal cause.[44]

40. Note, The Discretionary Exception and Municipal Tort Liability: A Reappraisal, 52 Minn.L.Rev. 1047, 1066 (1968).

41. *E. g.*, Donnelly v. Ives, 159 Conn. 163, 268 A.2d 406 (1970); Smith v. Commonwealth, Department of Highways, 468 S.W.2d 790 (Ky.1971); Commonwealth, Dep't of Highways v. Begley, 376 S.W.2d 295 (Ky.1964); McCullin v. State Dep't of Highways, 216 So.2d 832 (La.App. 1968), cert. denied, 253 La. 645, 219 So.2d 177 (1969); County Commissioners of Carroll County v. Staubitz, 231 Md. 309, 190 A.2d 79 (1963); McKinney v. County of Cass, 180 Neb. 685, 144 N.W.2d 416 (1966); Meabon v. State, 1 Wash. App. 824, 463 P.2d 789 (1970). *See also* 4 Blashfield, Automobile Law and Practice §§ 161.9–161.10 at 317–20 (3d ed. 1965); Bennett and Sather, State Tort Liability—The Design, Construction and Maintenance of Public Highways—Vehicular Accidents, 19 Drake L.Rev. 33, 35 (1969).
The following cases have applied ordinary negligence principles to suits against public authorities arising out of accidents on ice and snow-covered streets and highways: Walker v. County of Coconino, 12 Ariz.App. 547, 473 P.2d 472 (1970); City of South Bend v. Fink, 139 Ind.App. 282, 219 N.E.2d 441 (1966); Ewald v. City of South Bend, 104 Ind.App. 679, 12 N.E.2d 995 (1938); Tetreault v. State, 50 Misc.2d 170, 269 N.Y.S.2d 812 (1966); Bird v. State, 2 Misc.2d 244, 152 N.Y.S.2d 65 (1956); McCracken v. Curwensville Borough, 309 Pa. 98, 163 A. 217 (1932). *See also* 4 Blashfield Automobile Law and Practice § 163.11 at 380–83 (3d ed. 1965).

42. Our disposition of the case makes it unnecessary to consider whether the trial judge was in error in concluding that the state was not negligent in its design of the highway. For a recent and highly significant case on design liability see Baldwin v. State, 6 Cal.3d 424, 99 Cal. Rptr. 145, 491 P.2d 1121 (1972).

43. 432 P.2d at 610.

44. Id. at 610–611 (footnote omitted).

This is in accordance with the position taken by the Second Restatement of Torts.[45] Normally, in order to satisfy the substantial factor test it must be shown *both* that the accident would not have happened "but for" the defendant's negligence and that the negligent act was so important in bringing about the injury that reasonable men would regard it as a cause and attach responsibility to it.[46] There is, however, one significant exception to this concurrence requirement: if two forces are operating to cause the injury, one because of the defendant's negligence and the other not, and each force by itself is sufficient to cause the injury, then the defendant's negligence may be found to be a substantial factor in bringing about the harm.[47]

■■■■■ In determining whether the trial judge was in error in applying the above tests to the facts of this case, it must be kept in mind that Civil Rule 52(a) provides that the trial court's findings shall not be disturbed unless they are "clearly erroneous". As this court has explained before:

> A finding is clearly erroneous when, although there may be evidence to support it, we are left with the definite and firm conviction on the entire record that a mistake has been committed.[48]

We are left with no such conviction here. It is critical to note that the trial judge did not find that the state's negligence was the exclusive cause of the accident but rather that it was "*a* proximate cause" which combined with the concurrent negligence of Mrs. Vogt to cause the accident. Applying the "substantial factor" test outlined above, the trial court could have

properly held the state liable under one of two theories. First, if the state were negligent in failing reasonably to maintain the road and the accident would have occurred whether or not Mrs. Vogt was driving negligently, Mrs. Vogt's negligence does not affect the state's liability. This is the one situation outlined above where the "but for" test does not have to be satisfied. As Dean Prosser states:

> If two causes concur to bring about one event, and either one of them, operating alone, would have been sufficient to cause the identical result [then liability should be imposed].[49]

Second, if the accident would have occurred only with the concurrence of the negligence of the state *and* Mrs. Vogt, but would not have occurred if *either* party had been exercising reasonable care, it is also proper to impose liability on the state. As Prosser puts it:

> [A] defendant is not necessarily relieved of liability because the negligence of another person is also a contributing cause, and that person, too, is to be held liable. . . . The law of joint tortfeasors rests very largely upon recognition of the fact that each of two or more causes may be charged with a single result.[50]

■■■ Although the trial judge did not specify which theory he adopted in finding that the state's negligence was a proximate cause of the accident, we see no point in remanding to require him to choose one or the other. His conclusion is clearly supportable on well-established concurrent causation principles.[51] All of the following facts in the record support a finding that

45. Restatement (Second) of Torts § 430, comment d at 428 (1965).

46. Id. at § 431, comment a at 426–427 (1965).

47. Id. at § 432(2).

48. Alaska Foods, Inc. v. American Mfrs. Mut. Ins. Co., 482 P.2d 842, 848 (Alaska 1971).

49. W. Prosser, Torts § 41 at 239–40 (4th ed. 1971). See also Restatement (Second) of Torts § 432 (1965).

50. W. Prosser, Torts § 41 at 241 (4th ed. 1971). See also City of Fairbanks v. Nesbett, 432 P.2d 607, 610 (Alaska 1967).

51. These same principles have been held to apply in a number of cases involving suits against states for negligent highway maintenance. See 4 Blashfield, Automobile Law and Practice § 161.14 at 325–26 (1965), and cases cited therein.

the state was negligent and that this negligence proximately caused Brenda Vogt's injuries: (1) The curve was very icy and extensively rutted. The ruts tended to make a car deviate from a straight line. (2) The curve was very sharp and there was an undulating superelevation resulting from faulty maintenance. (3) Several expert witnesses testified that loss of control is a function of speed, friction and superelevation. If the coefficient of friction is increased by adding sand, or the superelevation made constant, the "critical speed" at which an automobile can successfully negotiate the curve is greatly increased. (4) There had been a series of similar accidents in which automobiles proceeding in the same direction as was Mrs. Vogt had skidded across the road into the oncoming lane of traffic. (5) A police officer testified that he had lost control under the same conditions as occurred at the accident. (6) The state had notice of the hazardous nature of the curve.

As the Restatement notes:

[Plaintiff] is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists.[52]

## IV

The state next argues that the findings of the trial judge with respect to the condition of the highway were clearly erroneous. As noted above, the trial court found that there was "very little, if any sand on the travelled portion of the highway" and that whatever sanding was done was inadequate. The state argues that a series of photographs introduced into evidence and the testimony of several witnesses clearly establish the error in the court's findings.

The standard on review, of course, is the clearly erroneous standard discussed in the previous section. Although it is true that in the case of non-testimonial evidence there is no need to give deference to the trial judge's evaluation of the credibility of witnesses, this court, in Alaska Foods, Inc. v. American Manufacturer's Mutual Insurance Co., 482 P.2d 842, 848 (Alaska 1971), rejected the argument that a more rigorous standard of review should be applied to non-demeanor evidence. In the case at bar, there was considerable testimony that little or no sand was on the road at the time of the accident. Moreover, not only was it never established precisely when the photographs were taken, but Trooper Carpenter, one of the investigating officers, testified that the pictures did not accurately represent the condition of the road. We cannot agree with the state's contention that the trial judge's findings were clearly erroneous.[53]

Finally, the state argues that the trial court's conclusion that the negligence of the state combined with Mrs. Vogt's negligence to proximately cause the collision made it imperative that the trial court specify with clarity the specific negligent

---

52. Restatement (Second) of Torts § 433 B, comment b at 443 (1965).

53. For a similar holding see Witek v. Town of Southbury, 132 Conn. 104, 42 A.2d 843, 845 (1945), where the court stated:
Numerous other witnesses testified to the existence and depth of the ruts, and we cannot say that the evidence presented by the photograph was so conclu-

sive of their non-existence as to discredit the oral testimony that they, in fact, existed. [citation omitted] 'If . . . the accuracy of the representation is questioned, this is a question for the determination of the jury like other questions of fact; and it is well known that even photographs may convey erroneous impressions.' (citation omitted)

acts of Mrs. Vogt. Failure to do so, the state argues, was a violation of Civil Rule 52(a).

This argument is without merit. Civil Rule 52(a) requires that "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon . . . ." The manifest purpose of the rule is to give this court a clear understanding of the basis of the lower court's decision.[54] The basis for the court's decision here is clear. Mrs. Vogt was not a party and we see no reason to remand for more specific findings as to her negligence.

## VI

■■■ Susan Abbott has cross-appealed from the judgment below challenging as inadequate both the $266,000 award of damages and the $16,700 award of attorney's fees.[55]

Regarding the adequacy of damages, we have held that

> [t]he general principle underlying the assessment of damages in tort cases is that an injured person is entitled to be replaced as nearly as possible in the position he would have occupied had it not been for the defendant's tort.[56]

In the case at bar the trial court found that as a result of the accident Brenda Vogt suffered severe brain damage and resultant coordinative and personality deteriorization, that she "will never be able to function as a normal member of society," and that she will always need supervision.[57] The court then found that Brenda had received total compensable injuries of $266,-000. Cross-appellant argues that based on the evidence she presented below "an award of no less than $1,060,000.00" would be minimal compensation.[58]

54. *See* Bohm v. State, 453 P.2d 410, 411 (Alaska 1969); Merrill v. Merrill, 368 P.2d 546, 548 (Alaska 1962). *See also* Fairbanks Builders, Inc. v. Morton De-Lima, Inc., 483 P.2d 194 (Alaska 1971).

55. A preliminary issue concerns the failure of Brenda Vogt to include specification of errors in her brief as required by Sup.Ct. R. 11(a) (6). The state has urged that we dismiss the cross-appeal because of this infraction. However, since cross-appellant's statement and supplemental statement of points on appeal, along with her brief itself, clearly notified the state as to the claims of error, no prejudice would appear to have resulted.

56. Beaulieu v. Elliott, 434 P.2d 665, 672 (Alaska 1967).

57. The court's specific findings were as follows:

> As a result of the collision here concerned Brenda Vogt received, among other injuries, very severe brain damage. This brain damage resulted in a change of personality of Brenda Vogt from a well adjusted, vivacious, lively, likeable youngster to an apathetic, dull and inactive, largely untrainable, sometimes disobedient and rebellious, physically uncoordinated individual.
>
> In addition to the brain injuries Brenda Vogt received other injuries to her body, including an injury to her

jaw and scars on various portions of her body.

> The brain injury is by far the most serious of the injuries received, and because of its nature and the permanent impairment resulting from such injury, largely overrides the other injuries, which in themselves would have been serious without the brain injury.
>
> I find that as a direct and proximate result of the collision here involved that Brenda Vogt will never be able to function as a normal member of society. I find that she does not need custodial care as such, but will aways need someone to look after her personal needs and to guard her against unsavory contacts, and generally to care for and to protect her.

58. Based on the cost of either three full-time nurse's aides or an analogous cost at the Valdez facilities, and Brenda's 59.5-year life expectancy, Brenda Vogt estimates that $694,960 would have been a reasonable award for future care costs. Reasonable compensation for impaired earning capacity is then estimated to be $350,000 based on the average life time earnings of all employed women in Alaska who are Brenda's age. In this regard, Brenda Vogt asserts that the court should have found that she is permanently unemployable. Finally, based on this court's affirmance of a $20 per day award for

We have concluded, however, that because of the absence of adequate findings the court's award is unreviewable. In Patrick v. Sedwick, 413 P.2d 169, 174–175 (Alaska 1966), this court emphasized the necessity for strict compliance by the trial court with the requirement of particularized findings, demanded by Civil Rule 52(a), in order to "afford us a clear understanding of the basis of the court's award."[59] In Patrick the lower court had made seemingly inconsistent findings as to past and future physical impairment, and as to loss of time and future impairment of earning capacity. The failure to comply with Rule 52(a) in the case at bar is, if anything, more egregious. The court did not indicate what elements of damages combined to yield the total award of $266,000. Nor were findings made as to lost earning capacity, past or future pain and suffering, past or future medical expenses, or the extent or cost of the future supervision which the court found Brenda would require.

Therefore, in order to afford a basis for review, we remand this case to the superior court for further findings on the issue of damages in compliance with Civil Rule 52(a).[60]

Brenda Vogt also contends that the trial court erred in awarding only $16,700 as attorney's fees, an amount considerably less than that which would have been awarded on the basis of the schedule contained in Alaska Civil Rule 82(a).[61]

In Patrick this court held that

when a party recovers a money judgment in contested litigation the trial judge should indicate on the record his reasons for nonadherence to the fee schedule set forth in Civ.R. 82(a) in determining his award of attorney's fees.

413 P.2d 169, 179 (Alaska 1966). The court below did just that. The trial judge stated that attorney's fees calculated on the basis of the Rule 82(a) schedule would be "totally unreasonable", that the degree of a plaintiff's injuries in a personal injury case resulting in a large damage award is not a proper measure of attorney's fees, and that the court would compute attorney's fees in accordance with the work performed. The court then allowed $400 a day for trial, $100 for each deposition, $1,000 for pleadings and motions, and $7,500 for trial preparation.

Cross-appellant also argues that the award was inadequate because of the complexity of the case, the excellent job done by her attorneys as acknowledged by the court, and the fact that over 800 hours

---

pain and suffering in Beaulieu v. Elliott, 434 P.2d 665, 674–675 (Alaska 1967), she claims that $434,350 would have been minimal compensation for this element of damages. When combined with the stipulated cost of past medical care ($15,711), the total estimated damage figure is just under $1,500,000.00.

59. *See also* Fairbanks Builders, Inc. v. Morton DeLima, Inc., 483 P.2d 194, 196–197 (Alaska 1971); Beaulieu v. Elliott, 434 P.2d 665, 670 (Alaska 1967).

60. Brenda Vogt argues that this court has a sufficient basis for "laying down determinations with respect to the amount of damages to be awarded so that this case would not need to be remanded other than to enter judgment in accordance therewith." Just such a procedure was rejected in Patrick v. Sedwick, 413 P.2d 169, 174 (Alaska 1966):

[A]ppellant urges this court, under Supreme Ct.R. 51(b), to review the dam-

age aspect of this case 'de novo and to enter corrective findings determining an adequate award.' It is not the function of this court to make new independent findings upon evidence which we did not hear. Our province on review is to determine alleged 'errors of law committed by the trial court in reaching its decision, and not to try the issues de novo.' (footnote and citations omitted)

61. The schedule contained in Civ.R. 82(a) would dictate attorney's fees of $27,450 or $22,450 depending on whether the fees are calculated on the basis of the total award of $266,000 or that award as reduced by the $50,000 settlement between Brenda and her mother. Since it appears that the court committed no error in departing from the Rule 82(a) schedule, it is unnecessary to decide which figure would have been the proper basis for a Rule 82(a) computation.

were spent in trial preparation as evidenced by affidavits. The court below correctly responded to this assertion by stating that the purpose of Rule 82(a) is only to partially compensate a client for the productive work done by his attorney, and that it is irrelevant that "actual attorney's fees are going to be several times this figure . . . . "[62] Nor is a contrary result compelled by McDonough v. Lee, 420 P.2d 459, 465 (Alaska 1966), where this court upheld an application of the Rule 82(a) schedule to a $300,000 personal injury recovery. In that case we merely held that the schedule's application did not constitute an abuse of discretion.

■ The award of attorney's fees is committed to the broad discretion of the trial court. In Palfy v. Rice, 473 P.2d 606, 613 (Alaska 1970), we stated:

> An abuse of discretion is established where it appears that the trial court's determination as to attorney's fees was manifestly unreasonable. (footnote omitted)

In this case "[t]here is a rational connection between the facts considered by the trial judge and his conclusion that the amount of the money judgment was not an accurate criteria for determination of the amount of attorney's fees to be awarded," and that a fee of $16,700 "was commensurate with the amount and value of legal services rendered . . . . " Froelicher v. Hadley, 442 P.2d 51, 53 (Alaska 1968). We find no abuse of discretion in the award of attorney's fees.

The trial court's decision is affirmed in all respects except for its award of damages. The award of damages is vacated and the case is remanded to the superior court with orders to make further findings of fact in compliance with Civil Rule 52(a) and to enter a new award of damages in conformity with those findings.

BOOCHEVER, J., not participating.

62. *See* Preferred General Agency of Alaska, Inc. v. Raffetto, 391 P.2d 951, 954 (Alaska 1964).