787 P.2d 1122

**Rayola HILDEN, individually and as guardian ad litem for Jeremiah Hilden and Heather Hilden, minor children, Plaintiffs-appellants,**

v.

**Dr. James BALL, Defendant-respondent.**

**No. 17394.**

· Supreme Court of Idaho.

May 22, 1989.

On Rehearing March 1, 1990.

Webb, Burton, Carlson, Pedersen & Webb, Twin Falls, for plaintiffs-appellants. Kenneth L. Pedersen argued.

Quane, Smith, Howard & Hull, Boise, for defendant-respondent. Andrew C. Brassey argued.

BAKES, Chief Justice.

Plaintiffs sued defendant, alleging medical malpractice in defendant's administration of anesthesia to Robert Hilden in preparation for surgery. The jury returned a

verdict for defendant. Plaintiffs then moved for a new trial. The motion was denied and judgment was entered accordingly. Plaintiffs appeal.

Robert Hilden was scheduled to have a hemorrhoidectomy on July 12, 1984, by Dr. Hayden Ellingham at Cassia Memorial Hospital in Burley. Dr. James Ball was to provide anesthesia during the surgery. Because of Mr. Hilden's obesity (440 pounds), Doctors Ellingham and Ball decided to place him on his back with his legs folded back over his abdomen during surgery, rather than the usual position of lying on the abdomen with legs down, because the normal position would greatly compromise Mr. Hilden's ability to breathe.

Dr. Ball administered general anesthesia following a standard sequence of drugs. Initially, a combination of valium and fentanyl was administered. Sodium pentothal was administered about fifteen minutes later. Testimony was given that after pentothal takes effect the anesthesiologist must "breathe" for the patient by manually ventilating or "bagging" the patient's lungs with 100% oxygen. Dr. Ball was unable to ventilate Mr. Hilden's lungs. He checked Mr. Hilden's upper airway for an obstruction and found none. Dr. Ball then administered the drug anectine to relax Mr. Hilden's vocal cords and other muscles so he could insert an endotracheal tube down Hilden's throat to assist his breathing. Mr. Hilden was then intubated and oxygen was administered, but even this failed to enhance Mr. Hilden's ability to receive air. Dr. Ball removed the endotracheal tube to make sure it was not defective or obstructed, then reinserted it. Hilden was still unable to receive air. Just minutes after he first received sodium pentothal, Hilden died from cardiac arrest brought on by lack of oxygen in the heart.

Robert Hilden was survived by plaintiffs Rayola Hilden, his wife, and Jeremiah Hilden and Heather Hilden, his children, who brought suit claiming that Robert Hilden died as a result of Dr. Ball's alleged negligent anesthetic care. Specifically, the Hildens asserted that Dr. Ball was negligent in not "pre-oxygenating" Mr. Hilden because Hilden's obesity might make him vulnerable to respiratory difficulty under anesthesia. There was testimony that pre-oxygenation might have increased his blood oxygen supply by ten percent.[1] The jury returned a verdict for Dr. Ball, and the Hildens moved for a new trial. The motion was denied, judgment for Dr. Ball was entered, and this appeal followed. We affirm the judgment of the trial court.

I

■ Appellants first contend that the trial court incorrectly instructed the jury that a local standard of care applied to Dr. Ball. We disagree. I.C. § 6–1012 mandates that a local standard of care is to be utilized in medical malpractice cases:·

**6–1012. Proof of community standard of health care practice in malpractice case.**—In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care, including, without limitation, any dentist, physicians' assistant, nurse practitioner, registered nurse, licensed practical nurse, nurse anesthetist, medical technologist, physical therapist, hospital or nursing home, or any person vicariously liable for the negligence of them or any of them, on account of the provision of or failure to provide health care or on account of any matter incidental or related thereto, *such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such*

1. There was testimony that Mr. Hilden probably had gone into a "bronchospasm," a condition where the lung capillaries contract and will not operate to transfer oxygen from the air to the blood. There was testimony that a 10% increase in blood-oxygen level would have provided additional time to attempt to overcome the spasms. Also, there was testimony that with that reserve he "might" have been resuscitated or would not have arrested in the first place.

*care allegedly was or should have been provided,* as such standard existed at the time and place of the alleged negligence of such physician and surgeon, hospital or other such health care provider and as such standard then and there existed with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he, she or it was functioning. *Such individual providers of health care shall be judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any.* If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered. As used in this act, the term "community" refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided. (Emphasis added.)

In order for the jury to find Dr. Ball negligent under I.C. § 6–1012, the jury would have to find, by a preponderance of the evidence, that Dr. Ball "negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided, ... as such standard then and there existed with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he ... was functioning." *Id.*

The instruction which was given followed I.C. § 6–1012. Instruction No. 3 reads as follows:

In order to prove that Dr. Ball was "negligent," the plaintiffs must prove, by direct expert testimony and by a preponderance of all the competent evidence, that Dr. James Ball, on July 12, 1984,

failed to meet the applicable standard of health care practice of the community in which such care was provided, as such standard then existed, with respect to the class of health care provider to which Dr. Ball belonged and in which he was functioning.

Physicians, such as the defendant Dr. Ball, shall be judged in comparison with similarly trained and qualified physicians in the same community, or in similar communities, taking into account his training, experience, and field of specialization, i.e., anesthesiology.

The term "community" refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was provided.

If Dr. Ball failed to meet the above standard of health care practice, then he is negligent. If Dr. Ball did meet such standard of health care, then he is not negligent.

The standard of care applicable to medical malpractice cases in this state is a local standard of care, as is clearly enunciated both in I.C. § 6–1012 and in our prior cases. *See, e.g., Robertson v. Richards,* 115 Idaho 628, 769 P.2d 505 (1987); *Dekker v. Magic Valley Regional Medical Center,* 115 Idaho 332, 766 P.2d 1213 (1988); *Smallwood v. Dick,* 114 Idaho 860, 761 P.2d 1212 (1988). The court's instructions here were based upon the local standard. Accordingly, the trial court committed no error in giving the jury Instruction No. 3.

II

■ Appellants next contend that the court's instruction regarding proximate causation was improper. They argue that a proximate cause instruction using loss-of-chance causation should have been given.[2] However, appellants did not request a loss-of-chance causation instruction, nor did appellants specifically object to the court's

---

**2.** Loss-of-chance causation requires proof that the defendant's negligence eliminated a chance to recover that the plaintiff would otherwise

have had. Loss-of-chance causation has not been judicially approved in Idaho, and is not an

given proximate cause instruction.[3] Accordingly, appellants will not now be heard to complain regarding the trial court's failure to give an instruction that appellants failed to propose in the first place. *Robert V. DeShazo & Associates v. Farm Mgt. Services, Inc.*, 101 Idaho 154, 610 P.2d 109 (1980); *Holland v. Peterson*, 95 Idaho 728, 518 P.2d 1190 (1974).

The proximate cause instruction which the court did give was Instruction No. 4, which reads as follows:

> When I use the expression "proximate cause," I mean a cause which, in natural or probable sequence, produced the damage complained of. It need not be the only cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes damage.
>
> For an act or omission by a defendant to be a proximate cause of a plaintiff's damages, you must find that the plaintiff's damages would not have occurred but for that act or omission, and that such act or omission was a substantial factor in causing the damages.
>
> An act or omission is not a proximate cause of a plaintiff's damages if the damages would have occurred without such act or omission.

■ The first paragraph of Instruction No. 4 was the pre-July, 1987, version of IDJI No. 230 and was Plaintiffs' Requested Instruction No. 4. Plaintiffs cannot now claim error in the giving of an instruction which they requested. *McBride v. Ford Motor Co.*, 105 Idaho 753, 673 P.2d 55 (1983).

■ Appellants also argue that the "but for" language in paragraphs 2 and 3 of Instruction No. 4 was erroneous. However, IDJI 230, as amended July 1, 1987, several months before the commencement of the trial of this matter, specifically adopted "but for" language in a proximate

cause instruction. IDJI 230 now reads as follows:

> When I use the expression "proximate cause," I mean a cause which, in natural or probable sequence, produced the complained injury, loss or damage, and *but for* that cause the damage would not have occurred. It need not be the only cause. It is sufficient if it is a substantial factor in bringing about the injury, loss or damage. It is not a proximate cause if the injury, loss or damage likely would have occurred anyway. (Emphasis added.)

Under I.R.C.P. 51(a)(2), once a trial judge determines that the jury should be instructed on a subject, it is recommended that the trial judge use an applicable IDJI instruction "unless he finds that a different instruction would more adequately, accurately or clearly state the law." Instruction No. 4 combined Plaintiffs' Requested Instruction No. 4 with the "but for" causation language from the most recent version of IDJI No. 230. Instruction No. 4 was an accurate statement of the law of causation in Idaho. Appellants have not proposed a different instruction which would "more adequately, accurately or clearly state the law." I.R.C.P. 51(a)(2). Accordingly, we affirm the trial court on this issue.

### III

■ Finally, appellants urge that the trial court erred in refusing to grant a new trial because the clear weight of the evidence established that Dr. Ball was guilty of negligence which was a proximate cause of Robert Hilden's death. However, it is not for this Court to determine where the "clear weight" of the evidence lies—that is the function of the trial court. Our task is limited to determining whether there was a manifest abuse of discretion by the trial court when it ruled that the jury's verdict was supported by the evidence. Our review of the record provides us no basis to

___

approved theory of causation in the Idaho Jury Instruction Manual (IDJI).

**3.** Appellants generally objected to all jury instructions which they did not propose; however, they did not give the trial court an opportunity to correct potential errors by stating specific reasons for objecting to the given proximate cause instruction.

rule that the trial court abused its discretion.

The judgment of the trial court is affirmed. Costs to respondent. No attorney fees awarded.

SHEPARD, HUNTLEY and JOHNSON, JJ., concur.

HUNTLEY, Justice, concurring.

I write only to point out that Part II and footnote 2 of the opinion do not stand for the proposition that this Court rejects the use of a loss-of-chance instruction in an appropriate case. As the majority notes, the issue was not preserved for appeal, and thus any ruling thereon would be dicta. The fact that the Idaho Jury Instruction Manual contains no form instruction on the theory does not speak to the status of Idaho law.

BISTLINE, Justice, dissenting.

## PART I

Justice Bakes has selectively taken an unusual approach in writing his opinion. The ordinary, better, and accepted practice, where a district court has granted or denied motions for judgment n.o.v. and for a new trial, is that this court first turns to and reviews the district court's written opinion. As a matter of recent case-precedent, *Quick v. Crane*, Part 4, Appellate Review, 111 Idaho 759, 770, 727 P.2d 1187 (1986), *requires* that the district court provide the reasoning or rationale for its decision, and where that hasn't been done, this Court remands so that it will be done in order that this Court can make an intelligent and meaningful review.

Here the district court provided us with a written decision, but, for reasons known only to himself, Justice Bakes elected to write on a clean slate, *i.e.*, without any regard for the district court's decision. Of the two opinions, that written by the district court more forthrightly addresses the two issues presented, so to that opinion my attention is primarily directed, as *Quick* requires. This review shall first consider the plaintiff's contention to the trial court

that there was prejudicial error in instructing the jury.

The instruction most clearly in error was given Instruction No. 4, which read:

When I use the expression "proximate cause," I mean a cause which, in natural or probable sequence, produced the damage complained of. It need not be the only cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes damage.

For an act or omission by a defendant to be a proximate cause of a plaintiff's damages, you must find that the plaintiff's damages would not have occurred *but for* that act or omission, and that such act or omission was a substantial factor in causing the damages.

An act or omission is not a proximate cause of a plaintiff's damages if the damages would have occurred without such act or omission.

The district court in making its *Quick* review was careful to note plaintiffs' contention that "the but for" test contained in the second paragraph was not appropriate. The district court defended the giving of this instruction by asserting that "[t]he Idaho Supreme Court had recently defined proximate cause," *Challis Irrigation Co. v. State*, 107 Idaho 338, 343, 689 P.2d 230, 235 (Ct.App.1984), and then quoted the excerpt from *Challis* upon which reliance was placed:

The concept of proximate cause contains two components—cause in fact, and scope of legal responsibility. (Citations omitted) ...

Proximate cause, in the sense of cause in fact, has been defined as a cause 'which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred.' (Citations omitted.) This component of proximate cause embraces two closely related elements. First, an event is the cause in fact of a succeeding event only if the succeeding event would not have occurred '*but for*' the prior event. Thus,

*an act or omission is not the cause in fact of ensuing damage if the damage likely would have occurred anyway.* The second element is a requirement that the first event be a 'substantial factor' in producing the succeeding event. (Citation omitted.) Thus, a defendant's conduct is the cause in fact of an event only if it was a material element and a substantial factor in bringing it about. (Citation omitted)

R., p. 208 (emphasis supplied). The district court went on to note that the "same language had recently been used in *Crosby v. Rowand Machinery Co.,* 111 Idaho 939, 729 P.2d 414 (1986)." Here the district court was somewhat in error. That language does appear in the *Crosby* opinion. The district court's citation to that case leaves the impression that it, too, was an opinion from the Supreme Court. However, the *Challis* and the *Crosby* opinions were both from the Court of Appeals. More aptly put, the Idaho Supreme Court was not responsible for either the *Challis* opinion or the *Crosby* opinion. [Nor was it responsible for a third "but for" sequel case where the same instruction was involved, *Edmark Motors v. Twin Cities Toyota, Inc.,* 111 Idaho 846, 727 P.2d 1274 (Ct.App.1987).]

Based upon the language found in *Challis* and *Crosby*, the district court reasoned that:

> The fact that the plaintiff has the burden of proving that a defendant's negligence was a substantial factor in causing damage to the plaintiff does not excuse the plaintiff from proving that the injury would not have occurred "but for" the defendant's negligence. Instruction No. 4 is also consistent with revised IDJI 230 (Rev. 7/87). The plaintiffs presented evidence that Dr. Ball's failure to preoxygenate was *the actual cause* of Mr. Hilden's death, *but Dr. Ball presented evidence that Mr. Hilden would have died*

*anyway.* Thus, it was necessary for the jury to be instructed on all aspects of proximate cause, including the so-called "but for" portion of the instruction.[4]

R. 208 (emphasis added). Here the district court erred in equating "*a* proximate cause" as the equivalent of "*the* actual cause." The court also relied on § 431 of the Restatement of Torts:

> Sec. 431 defines legal cause. It states, 'The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm,....' The Comment immediately following Sec. 431 states:

> > In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent.... (T)his is necessary, but it is not of itself sufficient. The negligence' must also be a substantial factor in bringing about the plaintiff's harm.

Restatement (Second) of Torts, Comment at p. 429.

R. 207. There is not, and should not. be, any problem with the "substantial factor" portion of the instruction. Substantial connotes a degree of more than trivial or slight.

*If* it had been established conclusively that Mr. Hilden was going to die that day, irrespective of the failure to preoxygenate, then the district court's analysis was sound, and nothing remained for Justice Bakes to attend to; it would be sufficient to set out the district court's opinion and affirm it. Unfortunately for Justice Bakes, however, he is caught on the proverbial horns of a dilemma. To adopt the district court's opinion would necessarily also entail accepting the fact that the Court of Appeals by its *Challis* case made new law, perpetuated in its *Crosby* and *Edmark* cases, which greatly modifies prior well-es-

---

**4.** There is no contention and also no testimony or evidence of any kind whatever that Mr. Hilden was dying, ill, or *in extremis.* It was not an emergency situation, but an operation where the surgeon and Dr. Ball had fully collaborated in advance as to the details. **No witness testified that Mr. Hilden would have died that day** **irrespective of whether he had been preoxygenated.** Justice Bakes, only by not deigning to address the district court's opinion, has thus far been able to avoid coming face to face with the district court's assertion that Dr. Ball presented evidence that Mr. Hilden would have died anyway.

tablished and time-tested Idaho proximate cause law. But, as Justice Bakes reminds us from time to time, and with which I agree, attorney James Keane of Wallace, Idaho (now deceased), cautioned this Court that one day it would have to face up to the determination as to which of the two appellate courts has law-making power. It appears to me that the day of reckoning is now present. Justice Bakes, as I see it, is ignoring *Challis, Crosby,* and *Edmark* in preference to announcing the new law of proximate cause as though it was now originating in this Court. Otherwise, that new law would have to be accredited to the Court of Appeals, from whence it most assuredly did emanate. In choosing his direction, Justice Bakes appears to be willing to accept the responsibility for creating bad law.

Moreover, I do not see the "but for" proximate cause instruction as applicable in

*Challis, Crosby,* or *Edmark,* but that is not our concern at this late date. The concern here is whether the "but for" instruction had any place in the instructions which the jury should have been given in *this* case. Smothered by deceptive language in Justice Bakes' opinion is the fact that plaintiffs requested *only* the first paragraph of given Instruction No. 4. Naturally the plaintiffs have not anywhere raised any objection to the giving of that portion of the instruction which plaintiffs requested. The objection which they registered at the instruction conference clearly[5] informed the district court that plaintiffs were against the giving of the modifications of the two paragraphs added by the district court under its misapprehension that this Court issued both the *Challis* and *Crosby* opinions. Justice Bakes in his opinion has noted that the IDJI instructions are recommended.[6]

5. Justice Bakes implies also that the plaintiff's objections were general, rather than specific. A closer regard for the appeal transcript would have saved him from the embarrassment of making that statement. The court had counsel make their specific objections off the record. Observe the following from Vol. 2 of the Transcript, page 472:

THE COURT: Before we go off-the-record, I have given counsel copies of the Court's proposed finally jury instructions, and I'd like for counsel to review those off the record. The time is 3:30 in the afternoon, and I'd like counsel to review those off the record and then I'll bring the Court Reporter in and we will put it on the record after you have had a chance to do that. And if you have any objections to those, and if I have to make any modifications, I will be able to do that. With that, Court is adjourned.

6. It should be noted that both the Idaho Rules of Civil Procedure and the IDJI instructions are drafted by committees but those committees appear to always be chaired by members of this Court.

In *Packard v. Joint School District No. 171,* 104 Idaho 604, 661 P.2d 770 (Ct.App.1983), Judge Burnett, writing for the Court stated:

Pattern jury instructions are *not* a separate source of substantive law; rather, they seek to embody existing law. *They are recommendatory in nature, not mandatory.* I.R.C.P. 51(a)(2). Thus, the substantive standard by which the jury instruction in this case should be judged is not a subsequently promulgated pattern instruction, but the underlying case law.

104 Idaho at 612, 661 P.2d at 778 (emphasis added). In other words, the case law precedent approving or disapproving instructions is of greater value than committee-drawn pattern jury instructions. The IDJI instructions are merely recommendatory. The trial courts should carefully note and take heed of Judge Burnett's guiding words.

Equally questionable is this statement in footnote 2 at page 5 of the majority opinion:

2. Loss-of-chance causation requires proof that defendants' negligence eliminated a chance to recover that the plaintiff would otherwise have had. *Loss-of-chance causation has not been judicially approved in Idaho, and is not an approved theory of causation in the Idaho Jury Instruction Manual (IDJI).*

(Emphasis added.) Obviously it is made in furtherance of the attempt to elevate IDJI instructions to an approved, and centrally drafted, definitive statement of Idaho law. As stated above by Judge Burnett, IDJI instructions are not intended to provide court-approved theories in any area of the law.

Furthermore, this footnote 2 is seen as an effort at creating the impression that loss-of-chance causation is somehow separate from the general principles of causation that apply in any negligence action. Thus, Justice Bakes' statement that loss-of-chance causation has not been judicially approved in Idaho is like saying that general principles of causation in any negligence action have not been judicially approved in Idaho, and hence meaningless.

So-called loss-of-chance causation merely addresses a specific factual situation—in this case Dr. Ball's decision against preoxygenating Mr. Hilden's blood supply, which would have in-

Not only did the plaintiffs not request the "but for" instruction, but note should be made that *the defendants, too,* made no request which includes that language or any language, which is found in the second and third paragraphs of Given Instruction No. 4. *In fact, the defendants did not submit any requested instruction on proximate cause*—which can only lead to the legitimate inference that defendant was content to have the jury deliberate its verdict in light of plaintiff's requested instruction on proximate cause. The district court, based on its reading of *Challis* made the determination to instruct the jury in particulars which both parties involved thought to be unnecessary and uncalled for.

The Court of Appeals in *Challis* observed an accepted proximate cause instruction found in *Smith v. Sharp,* 82 Idaho 420, 354 P.2d 172 (1960):

Proximate cause, in the sense of cause in fact, has been defined as a cause 'which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred.'

That is a sound instruction which has well served Idaho juries. That quotation was immediately followed, however, by an analysis which was of that Court's own making:

This component of proximate cause embraces two closely related elements. First, an event is the cause in fact of a succeeding event only if the succeeding event would not have occurred 'but for' the prior event. *Thus, an act or omission is not the cause in fact of ensuing damage if the damage likely would have occurred anyway.*

*Challis Irr. Co. v. State,* 107 Idaho 338, 343, 689 P.2d 230, 235 (Ct.App.1984). This "first element" *was not backed by a single*

*citation of authority.* As a matter of fact, no such instruction was given in the *Challis* case. At that point in its opinion that court had not mentioned the instruction which the trial court had given on proximate cause. That court then proceeded with a discussion of the fault in the instruction which was given, *but not questioned on appeal by either party:*

In the present case, the jury was given an instruction on proximate cause corresponding to Idaho Jury Instructions (IDJI) No. 230. This instruction focuses upon cause in fact, but it does not expressly set forth either the 'but for' element or the 'substantial factor' element. Rather, the instruction simply explains 'proximate cause' as:

a cause which, in natural or probable sequence, produced the damage complained of. It need not be the only cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes damage.

This instruction does not completely explain the elements of cause in fact. Moreover, the instruction does not make it entirely clear that in order for a concurring cause to give rise to liability, it must be a proximate cause in its own right. *See Miller v. Northern Pacific Railway Co.,* 24 Idaho 567, 135 P. 845 (1913), and cases cited in 57 AM.JUR.2D *Negligence* §§ 176–82 (1971). *However, this instruction was given without objection by either party. No issue concerning any of the jury instructions has been raised in this appeal.* Consequently, we will confine our analysis to causation as the jury was instructed. The question put to the jury was whether the increased water depth in the canal, attributable to clogging at the trash rack, 'produced' the damage 'in natural and probable sequence ... in combina-

---

creased his blood oxygen supply by 10 percent, and thereby improved his opportunity to avoid suffering cardiac arrest due to a low level of oxygen in his blood. Simply put, loss of chance, by whatever name it might be known, is not a novelty. It simply presents the question whether Dr. Ball's failure to preoxygenate Mr.

Hilden was a contributing cause in Mr. Hilden's untoward and wholly unanticipated death. Or, in other words, did any action or omission of Dr. Ball deprive the inert and anesthetized body of Mr. Hilden of additional time to achieve introduction of life-saving oxygen into his lungs?

tion with' the increased flow of water entering the canal from the river. *Challis Irr. Co. v. State*, 107 Idaho at 343, 689 P.2d 230.

Truly, this was a classic display of gratuitous comment, more commonly known under the rubric of *dicta*. Other than but for the fact that the district court in Mr. Hilden's case accepted it as gospel coming from the Supreme Court, which had to be followed, it would be otherwise of no moment, other than educational. Unfortunately the 'but for' language therein contained was thought by West Publishing Co. to be a *holding* in the opinion, and was so treated in headnote 7, and in turn so accepted by the district court in this case.

## PART II

Dr. Ball took the stand in presentation of the case for the defense. Although the incident which culminated in the death of Bob Hilden took place in the Cassia County Hospital, Burley, Idaho, unmentioned in Justice Bakes' opinion is that Dr. Ball's credentials were such that he certainly could have practiced his specialty *anywhere* and had done so. He graduated from Hanemann Medical College, Philadelphia, Pennsylvania, in 1954, and then completed a one-year internship at Robert Packer Hospital in Sayre, Pennsylvania. He had only practiced at Cassia Memorial Hospital since 1981. He also practiced medicine in the Twin Falls and Idaho Falls areas. At the trial in November 1987, he said that he had retired, and was living in Wyoming.

His practice in Cassia County Hospital was as an anesthesiologist. Prior to moving to Cassia County, he had practiced at the resort area of Sun Valley and Ketchum for twelve years, starting in 1958, following which he practiced at a 500–bed hospital in Santa Barbara, California. Dr. Ball not only performed as an anesthesiologist, but performed open heart surgery.

As to the critical issue of preoxygenating patients about to undergo anesthesiology prior to surgery, he testified that *his standards weren't any different in California or Twin Falls or Pocatello or Burley*.

Questioned as to standards of care that have to be adhered to anywhere, he answered, "I would say the most pertinent standard is one is always aware of the safety of the patient, knowing that *we are dealing with very toxic and potent drugs*, and knowing that the *patient has to have assured ventilation to survive*." At that point the examination was directed specifically to his care of the deceased Mr. Hilden:

Q. I want to talk about Bob Hilden. You were in charge of his anesthesia?

A. I was.

Q. And you used before induction, and into anesthesia, you used a drug called Fentanyl?

A. I did.

Q. And Fentanyl is a narcotic medication?

A. Yes, it is.

Q. It acts as a respiratory depressant?

A. Yes.

Q. And prior to the anesthesia you had a conversation with the patient in order to get a meaningful history from him?

A. Yes.

Q. And that was something you were supposed to do in order to do your job?

A. I did that.

Q. And part of the job is not only ask the questions but to listen to the answers?

A. Yes.

Q. And one of answers to your questions was well, Doc, I have trouble breathing when I lay down?

A. That is true.

Q. And you knew that going in?

A. Yes, sir.

Q. You also knew from the history he was way overweight?

A. Yes, I knew that.

Q. And you could tell that by looking at him probably?

A. That is true, It's not all possible to judge how many pounds, but that was available also.

Q. He was a big man?

A. He was very big.

Q. Actually you determined it wasn't very hard for him to become short of breath?

A. That is true.

Q. And you would have expected that with a man of his size?

A. I would have expected it.

Q. *And you came to the conclusion his ventilation was already compromised?*

A. *Yes, I did.*

Q. And you were concerned going into this that the mere bulk that he had around his neck and his throat and in his mouth, might cause a problem with getting gases down into his lungs.

A. Without adequate protection in the airway, yes.

The doctor was examined in some detail as to preoxygenating Mr. Hilden:

Q. I want to get to something that is really important. Is it your testimony under oath today that he was preoxygenated?

A. No, it is not.

Q. Yesterday you said something about I think, you might have, or you think you did. What are you trying to tell us?

A. Well, again, it depends on the definition of preoxygenation and when it was first administered and et cetera.

Q. You are not—

A. I did not preoxygenate him throughout that period of 15 minutes.

Q. *You did not preoxygenate him prior to induction?*

A. *No, I did not.*

. . . .

Q. And—Well, let's go to the next step. Now actually isn't it true that *it was your plan to go ahead and give Bob Hilden some 100% oxygen before you attempted to put the tube down?*

A. *Yes.*

Q. And I suppose that that was before you were planning to do this before you gave him the Anectine to paralyze him so he doesn't' breathe at all?

A. Yes.

Q. And the reason you wanted to do that was as we said before was to give him more time if you run into any kind of problems?

A. *It's my standard practice as soon as feasible to as soon as he will tolerate the mask, to give him 100% O'2 [oxygen] and augment his breathing.*

Q. And that—And in your plan, you were disappointed you didn't get to do it?

A. *I was not able to move air after induction.*

Q. After induction and if everything is going according to plan as far as you are concerned, if you put the mask on him and you can't get any air down there?

A. That is true.

Q. And so then you have got a problem, you're outside of your plan?

A. That is true. *I was not able to get the oxygen in.*

Q. And the first thing is to try and figure out how to get oxygen down into him because *you don't have all the time in the world?*

A. *That is very true.*

Q. And there is a critical time period in the patient's life?

A. That is true.

Q. And you immediately decided to put the nasal pharyngeal in as a temporary measure I think?

A. That is the very first step in any upper airway obstruction.

Q. And at the same time you're doing this you are also doing some diagnosis. You're going to find out what was wrong by going through the steps?

A. Yes.

Q. And you want to know what is wrong and want to solve the problem?

A. I certainly do.

Q. And you don't have much time?

A. (No response).

Q. *You don't have how much time?*

A. *I don't have unlimited time.*

Q. *And you had less time than if you preoxygenated.*

**324**

MR. BRASSEY: There is no evidence of that. I object. It misstates his testimony.

THE COURT: Overruled.

MR. PEDERSON: I just asked him a question.

A. *It would be hard to quantify how much time.*

BY MR. PEDERSON:

Q. *But you would have had more time if you would have preoxygenated.*

MR. BRASSEY: More time to do what? Can you be more specific?

BY MR. PEDERSON: To solve the problem. You understand what I am talking about?

A. *I would have had some more time.*

. . . .

Q. You have a problem, right?

A. Yes.

Q. And you know where we are in time-frame?

A. Yes.

Q. *And you can't get air into a guy and you have taken his ability to breathe?*

A. Yes.

Q. *On his own?*

A. *Yes.*

Q. And you gave him some Atropine or Anectine?

A. *Anectine, right.*

Q. *And that paralyzes his lungs and he couldn't breathe?*

A. *That is true.*

Q. And you are not able to quantify how much more time, but *if you* would be able to *preoxygenate you would have had more time* to work on this problem?

A. *Some more time.*

Q. Okay. And that problem is first went into by putting the nasal pharyngeal down into his nose and back in this pack part of the throat?

A. That is true.

Q. And that didn't work?

A. It did not.

Q. So the next step—And then you had given him this anectine, but to do that you have to if I understand this right you have got to—Did you have to draw it?

A. It's already drawn.

Q. You had to put it into the port and push it into the vein?

A. Yes.

Q. Can you just push it all at one shot?

A. The Anectine, yes.

Q. And you wait until you see how long it takes. And that is thirty seconds?

A. Yes.

Q. And the first thing first of all it takes some time to tell you have a problem.

A. In the case it took a very short period of time, and then give the Anectine?

A. Few squeezes on the bag.

Q. And then you have done this a zillion times?

A. Many, many, many times.

Q. *And you have given Anectine and wait to see what it's going to do?*

A. *That is true. In the meantime I'm still attempting to squeeze the bag and get oxygen in there.*

Q. Without success?

A. *Without success.*

Q. And then you didn't feel like the Anectine or you had given enough?

A. Yes. I tested the jaw and it was still tight so I gave the second dose.

Q. Took some time to test the jaw?

A. No, not really. You just reach up and take the mask off and wiggle it and put the mask back on.

Q. And you gave another dose of anectine?

A. Yes. Again it takes a few seconds to push it in.

Q. Okay. Did you have two syringes of Anectine ready to go?

A. No. There was enough in one.

Q. And you have to wait for that new drug to take affect?

A. (Witness shaking head).

Q. Correct?

A. Perhaps not as long as one waits for the first injection.

Q. Then it takes time to take the nasal out?

A. No, there is no need for that.

Q. Just leave it in?

A. Yes.

Q. And it takes time to put the nasal down into the trachea?

A. Yes, sir.

Q. And then you generally try to ventilate?

A. (No response)

Q. You have to hook the bag, the apparatus, ventilating machine, wrap it up to the tube in the mouth?

A. Yes.

Q. You have to do that?

A. Yes.

Q. And then you try it?

A. Yes, try to ventilate.

Q. Without success?

A. Exactly.

Q. And then you checked the tube again?

A. Yes.

Q. *And then you withdrew the tube?*

A. *Right.*

Q. *And you put it back in?*

A. *Yes. I found no obstructions, so I re-intubated.*

Q. And you had some question about its location or you wouldn't have checked it?

A. I only knew that I still could not ventilate, which could mean improper placement or plugged tube or, you know, several other possibilities.

The examination shifted back to preoxygenation:

Q. Now, is it your opinion in most instances, preoxygenation after induction is adequate?

A. Yes, indeed.

Q. And *there are some physicians even in this part of the country who preoxygenate every single time?*

A. *Yes, I'm aware of that.*

Q. Now, your opinion today of what happened is a bronchospasm that wouldn't let go and wouldn't stop?

A. Exactly.

Q. When do you think that started?

A. I think it started immediately after induction.

Q. And you were never able to ventilate this patient?

A. At no time did I have adequate ventilation post induction.

Q. And at no time did you have good exchange?

A. Exactly.

Q. Now, let's—You understand Doctor Eltherington thinks that probably wasn't a bronchospasm? He disagrees from looking at the records?

A. I was the one squeezing the bag.

Q. I know. But you know what Doctor Eltherington said here a couple of days ago?

A. I heard him say that.

Q. And did you treat the bronchospasm?

A. Yes.

Q. How?

A. Actually first injection I gave was Atropine. And that was as much for bronchospasm as it was for the bradycardia.[7] The bronchospasm was treated by Epinephrine.

Q. Epinephrine?

A. Yes.

Q. And anything else?

A. It's not listed here but I gave Emmanopoline.

Q. Is that a common drug you use to try to reverse a bronchospasm?

A. Yes.

Q. When did you give Emmanopoline?

A. That was, you know, it's indeterminant. It was some minutes into the CPR.

Q. Okay. And Epinephrine can help? Actually with Epinephrine, you give that

7. Bradycardia is the medical term for "abnormal slowness of the heart beat, as evidenced by slowing of the pulse rate to 60 or less." *Dor-* *land's Medical Dictionary* (24th ed.). Dr. Ball testified that Mr. Hilden's pulse went down from in the 90's to the 60's, to 29, and to 20.

to people that have an asthmatic condition and are critical? It is a classic drug, adrenaline?

A. And treatment of bronchospastic problems.

Q. And when did you give adrenaline?

A. That was about the same time.

Q. So let's see. We don't disagree that bronchospasm can happen. A minute ago you told me and I didn't know where it was, but I looked at it during the break and aren't most bronchospasms of brief duration?

A. All the bronchospasms I have treated in the past were or did not terminate in death. They off times lasted many minutes, and I am not sure what you mean by brief.

Q. Well—

A. You earlier mentioned seconds and minutes.

Q. Yes. And that is wrong?

A. That is very wrong.

Q. And that is your testimony under oath today?

A. Yes.

Q. Okay. Let's take a look at he deposition, page 45.

On the question of a bronchospasm, counsel read to the doctor from the doctor's deposition:

Q. I'm not trying to give you a bad time, page 47. I guess I'm a little nervous. I'm going to read your answer and—The question and your answer that you gave to me under oath in 1986 in May during your deposition. And you tell me whether that is the answer you gave me then. 'Would you agree with me that bronchospasm is quote rare phenomenon in your business?' Answer 'No. I would not say rare.' Question. 'Uncommon?'? Answer. 'It's not even uncommon. It's unusual for it to persist. It's usually self limiting.'. Question. 'How long does it usually persist?'? Answer. 'Oh, you know, seconds a minute at the most.'.

Following this reading, this question was asked and this answer was given:

Q. Was that the answers you gave at that time?

A. That is.

We have all seen these records, and this anesthetic summary, Plaintiff's Exhibit 2, and it has a box that says operative complications. I think that it's page 166 Exhibit 1 if you want to look at it?

A. Excuse me.

Q. You want some time to look at the context of what you said?

A. No. I have it.

Q. Okay. Operative complications?

A. Yes, sir.

Q. I guess that is where you are supposed to put down what went wrong?

A. That is filled in after the fact.

Q. And you didn't put down bronchospasm there?

A. I put down tight lungs which to me was synonymous.

Q. Yes. You didn't put down bronchospasm at that time. Did you tell Doctor Ellingham you were bewildered about what happened?

A. Well, I think he used the word yesterday, bewildered. I believe at that time I told him I couldn't put a specific finger on what happened.

Q. Okay. Thank you. Now, the surgical anesthesia record you have remarks over on the right-hand side you list one through seven events. You didn't put bronchospasm there, did you?

A. No, I did not.

Q. You are familiar with these records by now I'll bet?

A. Yes.

Q. You called the CPR, the code?

A. What was the question?

Q. You called for CPR?

A. Yes.

Q. Because everybody comes running in and Doctor Wood came running in?

A. That is true.

Q. And Doctor Wood took the stethoscope?

A. I had a stethoscope on my machine ready for immediate use.

Q. And he listened to the lungs?

A. That is true.

Q. And the nurse in these records has reported that there was good air exchange?

A. I do not believe that was Doctor Wood's statement that she was recording.

Q. It's in the record?

A. Yes, I know that.

Q. And she wrote it down?

A. After the fact.

Q. On the same day?

A. I presume so.

The questions and the doctor's answers at the close of the cross-examination were these:

Q. Okay. You talked to the family on the day of this tragedy?

A. Yes.

Q. Did you tell them that he died— *That their father and husband died from bronchospasm?*

A. I do not believe I did make a specific statement.

Q. Okay. I'm getting close. General anesthesia is a serious business, isn't it?

A. Yes, it is.

Q. And you actually take people close to death and bring them back?

A. You mean, in the midst of general anesthesia you take them to death?

Q. Yes.

A. We also take people who are about to die and bring them back.

Q. I know that. And it is never acceptable in any place in the country for a physician to subject a patient to unnecessary risk?

A. Nor unnecessary death.

Q. Your job and another way of putting it, it's your job to give that patient every break you can in case something goes wrong?

A. To safeguard him through anesthesia.

Q. And to fail to do so is substandard practice?

A. *To fail to safeguard him is substandard practice.*

The foregoing excerpts of Dr. Ball's testimony are summarized in appellant's opening brief:

Robert Hilden died before the hemorrhoidectomy began. Dr. Ball administered the general anesthetic following a standard sequence of drugs: first, a combination of valium and fentanyl; and then, about 15 minutes later, pentothal. The valium and fentanyl are administered to relax the patient and as a pain-killer. The pentothal takes away a patient's ability to breathe on his own by paralyzing the necessary muscles. After the pentothal takes effect, the anesthesiologist must 'breathe for' the patient by manually ventilating the patient's lungs.

Dr. Ball was unable to ventilate Robert Hilden's lungs for crucial minutes after the pentothal was given. Robert Hilden died minutes after receiving the pentothal as a result of a cardiac arrest brought about by the fact that the heart was not receiving oxygen.

The above facts are not contested.

That brief also summarized the testimony of Dr. Klippert, the only outside expert testifying for the defense, "Defendant's expert, Dr. Steven Klippert, an anesthesiologist who practices in Twin Falls, testified that the vast majority of patients he preoxygenates are those receiving emergency surgery, and that he does not preoxygenate all obese patients." Dr. Klippert's testimony established that he had been practicing in Twin Falls for approximately two years, and before that completed a two-year residency in anesthesia at the Cleveland Clinic Foundation and a one year surgery residency, plus two and one-half years as an emergency room physician. On his direct examination he explained the difference between a spinal and a general anesthesia procedure, in connection with preoxygenation:

The lungs normally contain approximately 79% hydrogen because of the fact that the air we breathe has that percentage. Preoxygenation is where 100% oxygen administered for a length of time sufficient to replace the nitrogen in the lungs with oxygen. The purpose being to allow more time for the patient to go without breathing during anesthetic or take over yourself.

Q. When you say take over yourself, what do you mean?

A. It's very common and almost routine for anesthetics to affect the patient's breathing. It's essential in most if not all the cases for us to assist the breathing especially in general anesthetic. Spinals obviously they can still breath on their own, but a general anesthetic, most of the time we do it in such a way that breathing stops, itself, and we have to breathe for the patient, and we have to breathe for the patient after we have given a general anesthetic.

Q. Is that through for instance an endotracheal tube?

A. Very commonly but not necessarily.

Q. Have you used endotracheal tubes before?

A. Very frequently.

Q. Now, in your patients that you put under a general, do you preoxygenate all of those patients?

A. No, I do not.

Q. What percentage do you preoxygenate?

A. The vast majority I do preoxygenate are those who have emergency surgery because they are suspected of having a full stomach having eaten recently and the emergency need to do surgery eliminates the opportunity to allow time to pass for their stomach to empty prior to the surgery.

After being asked by defense counsel to make certain assumptions, he was asked for his opinion to a reasonable degree of medical certainty whether or not the fact that Mr. Hilden did not have preoxygenation caused his death. He answered and explained his answer:

A. No. I have an opinion that no, preoxygenation under those circumstances would make any difference.

. . . .

Because once the endotracheal tube is placed, it allows the person to administer oxygen and normally it's very easy to revive a patient unless they become severely lacking in oxygen prior to that time.

He was then again asked virtually the same question in relation to the Burley, Idaho, standard of care:

Q. Doctor, do you have an opinion to a reasonable degree of medical certainty whether or not the fact that Doctor Ball didn't administer 0'2 [oxygen] to this patient prior to induction 7:36 breached the standard of care in Burley, July 12, 1984, standard of care applicable to him.

His answer was not straight-forward:

A. I have an opinion. I do not believe that would be *necessarily* a breach of standard of care.

Of significance he did *not* state the standard of care in Burley. He was not asked what the Burley standard of care was. He was not asked if he knew the Burley standard of care.

Only on cross-examination was that developed by *plaintiff's* counsel:

Q. Thank you. Now, you never have practiced over her in Burley?

A. That is correct.

Q. But you know the standard of care as it relates to preoxygenation without ever being here; is that correct?

A. I believe I can speak with authority on the standard of care for Burley, yes.

Q. Well, the standard of care as regarding preoxygenation really doesn't vary that much from town like Burley to Twin Falls?

A. No.

Dr. Klippert, though a defense witness, gave testimony which was candidly frank and helpful to plaintiff's case in critical aspects.

A. I have read this text book [Drips is a beginning text book of anesthesia] in entirety on two occasions. I won't claim that I agree with all the opinions expressed in here. What I have said does not contradict what is stated in this paragraph. He is talking abut someone who has had anesthesia induced and administering some oxygen via a mask and a bag prior to the administration of relaxants. He is not talking about stating the preoxygenation is necessary in all patients. I

can further state that the vast majority of anesthesiologists do not routinely preoxygenate all of their patients. There are a few, granted.

Q. Could I have it back? You're saying that it says assuming that the tracheal intubation is performed, neuromuscular blocker, they should be preceded by several inflations of lungs to provide the reserve of oxygen. I want to see if we understand what reserve of oxygen is. Is that what you meant by the extra oxygen you have in your lungs after you have taken a bunch of pure oxygen you increase the amount of reserves, is that what it is?

A. Correct. I believe Doctor Ball attempted to do exactly that in this case.

Q. But he couldn't get it done, could he?

A. No, he couldn't.

Q. Now, this was no ordinary patient?

A. That is correct.

Q. He was no ordinary patient. Would you agree with the other two witnesses who testified here that he had compromised ventilation?

A. It is common in overly obese patients. I did not examine or I have never seen this patient, so I wouldn't be able to render a judgment on that other than to say that it is common in morbid obesity.

Q. And consequently to have a low oxygen reserve?

A. That is correct.

Q. And the doctor who is going to put this patient under anesthesia should take that into consideration?

A. That is one of the considerations.

Q. Pardon?

A. That is one of the considerations in morbid obesity.

Q. Another consideration is that patient may suffer from an upper airway obstruction and you won't be able to breathe without intubation?

A. That is correct.

Q. Would you also agree with me that CPR on a person of this obesity, this heavy, that CPR would be difficult?

A. Yes.

Q. It would be much easier to take a thin person and try to revive him than it would be an obese person?

A. That is correct.

Q. And any anesthesiologist would know that?

A. I would assume so.

Q. And Doctor Ball knew if he got into trouble and had to call the code as they call in and start CPR it was going to be tougher to bring him back than the ordinary person?

A. I can't speak for Doctor Ball.

Q. Well, should he have known that?

A. He should have known that.

Plaintiff's brief also furnishes us with a synopsis of the testimony of Dr. Eltherington, all of which statements are correlated to the appeal transcript and on examination are free of any mistake:

Plaintiffs called Dr. Loren Eltherington, a Board Certified Anesthesiologist, who practices in California, as an expert witness. He testified that Dr. Ball's failure to have Hilden breathe 100% oxygen prior to administration of the pentothal (a practice called preoxygenation) was negligent, Rptr. Tr. pp. 47–48, 52–55, 76–80, and caused Robert Hilden's death, Rptr. Tr. pp. 53–54, 58, 74–76, 78.

Dr. Eltherington explained that a patient needs a reserve of oxygen in his lungs to survive the interruption of the oxygen supply after the pentothal takes effect, Rptr. Tr. pp. 47–48, 51–54, and that a sufficient reserve is particularly critical when the anesthesiologist anticipates difficulty ventilating the patient, Rptr. Tr. pp. 53, 55. He testified that this reserve can be significantly increased by having the patient breathe pure oxygen (as compared to the 21% oxygen in the atmosphere) prior to the pentothal without any risk to the patient. Rptr. Tr. pp. 54–55.

Dr. Eltherington also testified that Dr. Ball should have anticipated difficulty manually ventilating Hilden's lungs because of Hilden's weight—approximately 440 pounds—and should have recognized that Hilden's oxygen reserve would have

been compromised by his weight and the respiratory depressants, Rptr. Tr. pp. 45–46, 50–52, 63–64, valium and fentanyl.

Dr. Eltherington testified that the standard of care for an anesthesiologist mandated that a patient of Robert Hilden's weight be given 100% oxygen prior to receiving the pentothal and that Dr. Ball's failure to do so was negligence.

Q. How should this case have been handled?

A. You would like to get as much backup as possible. It's like wearing a belt and suspenders, I think. If you fill the lungs with oxygen, in other words, when Mr. Hilden first arrived in the operating room you simply put an oxygen mask on him, and put it on lightly and tell what they are doing and he breathes 100% oxygen. *Even though the drugs will depress his breathing and even though the anesthetic will depress his breathing and even though the muscle relaxants will stop him from breathing, he has this big bucket full of oxygen.* So it gives you time to establish an airway and/or to intubate the patient and carry on providing him with his breathing. And that is mandatory (sic) if you're dealing with a patient where you suspect at all that there may be some difficulty in ventilating and making him breathe and a bag or mask and intubating him and that is putting a tube in his airway. Without that the reserves are so small you have no time to get it intubated. Rptr. Tr. pp. 47–48.

A. ... what is necessary if you're going to deliberately depress respiration or breathing, you need more reserve, and the way you get more reserve you simply have the patient breathe 100% oxygen. What that does, it is like opening or putting another hose in the bucket *so that when all of the breathing has been stopped, by the drugs you now have this much reserve of oxygen so that you can take three or four or five minutes or maybe six minutes before you establish this airway before that patient gets into trouble with lack of oxygen to his heart and brain and liver and kidneys.* You just have more time because you have more oxygen sitting in the lungs to give you the time. The blood keeps picking up the oxygen and you start off with this big reserve which allows you to deal with difficulties.

Q. *Is there danger in giving that oxygen prior to induction of anesthesia?*

A. *None whatsoever.* Rptr. Tr. pp. 54–55.

Q. Doctor, I want to talk about the principal (sic) that we use by law in these actions called in these cases the community standard of care. Do you have actual knowledge of the community standard of care as it existed for this case in 1984 as it applied to Doctor Ball taking into consideration his background and training?

A. Yes, I feel I do.

. . . .

Q. Do you have an opinion based on reasonable medical certainty whether the appropriate standard of care was maintained by Doctor Ball in July of 1984 on the 12th?

A. Yes, I do.

Q. What is that opinion.

. . . .

A. Is it thinkable to you and within your imagination that it could be the standard of care anywhere to treat this patient and anticipate the problem the way they were done in this case?

A. No. It's not. Rptr. Tr. pp. 76–78. Dr. Eltherington testified that Dr. Ball's failure to administer 100% oxygen to Hilden prior to the pentothal deprived him of the reserve of oxygen he needed to survive the interruption in the oxygen supply when Dr. Ball attempted to manually ventilate his lungs. Rptr. Tr. pp. 53–55. Dr. Eltherington explained that when Dr. Ball had problems ventilating Hilden, Hilden's reserve of oxygen ran out, the heart received no oxygen, and the heart muscle died.

A. ... Now, what you do is shut the spigot off. You simply close the tap, and the patient now cannot breathe because he is paralyzed and he can't be ventilated because his tongue and all the tissue in the huge neck has fallen down over his windpipe, and it takes four minutes, whatever, to put the intratracheal tube and during that four minutes time unfortunately his reserve is gone, and his heart doesn't get enough oxygen and he dies. I really think that is what happened with this patient. Rptr. Tr. pp. 53–54.

Q. ... do you have an opinion based on reasonable medical certainty about what difference adherence to that standard of care would have made to Bob Hilden?

A. I think as I mentioned, I think if that patient had been preoxygenated from the very beginning of the injections of drugs and allowed that reserve, I think this patient might well have been resuscitated.

Q. Okay.

A. I'll go one step further, my patient in my opinion would not have arrested in the first place. Rptr. Tr. p. 78.

As Dr. Eltherington explained, Dr. Ball's failure to provide Hilden with the necessary oxygen reserve subjected Robert Hilden to unnecessary risks. Because of Hilden's reduced oxygen reserve, Ball was unable to ventilate the lungs prior to cardiac arrest and death.

Equally accurate is the statement in the brief as to the standard of care:

On one issue there was no conflict in the expert testimony. All physicians testifying concerning the standard of anesthetic care testified that there was no geographic variation in the standard of care for anesthesiologists as it relates to preoxygenation. Rptr. Tr. pp. 42, 76–78 (Dr. Eltherington), pp. 372–737 (Dr. Ball), pp. 457–458 (Dr. Klippert). Dr. Ball also testified that it was always a violation of the standard of care for anesthesiologists to submit the patient to unnecessary risks of harm. Rptr. Tr. p. 405.

## PART III

Notwithstanding this non-divergence of testimony on the standard of care, *i.e.*, in the field of anesthesiology, the district court gave the jury an instruction which was not needed, and, in fact, an instruction on the very point where defendant has his witness, Dr. Klippert testify without first establishing that he knew the applicable standard of care. As shown above in excerpts from the Dr. Klippert testimony, the standard would not deviate.

Nevertheless, the district court gave the usual community standard of care instruction, *i.e.*, that Dr. Ball *shall* be judged in comparison with similarly trained and qualified physicians in the same community. And the court explained that community refers to the geographical area served by what had to be the Cassia County Hospital in Burley.

This instruction very well could have induced in the jurors the belief that where Dr. Ball appears to have been the only local anesthesiologist, his actions could not be judged in light of the testimony of Dr. Eltherington, from Palo Alto, California (notwithstanding that Dr. Ball had practiced at Santa Barbara, California). Conceded, it is speculative, but it is not wild speculation. There would have been no room for speculation if the instruction has not been used in this case.

## PART IV

The real fault in the instructions is not open to honest debate. The plaintiff's requested instruction on proximate cause had been *judicially approved*—used many, many times. The instruction suggested by the Court of Appeals had been *judicially created*, but arose wholly out of gratuitous comment. The "but for" instruction cannot be said to have been judicially approved in Idaho prior to what is taking place today. Unless there is a turnabout in the Court, it is about to be judicially approved, and foist poor law off on to an unsuspecting citizenry of Idaho. It will become a new tool for defense attorneys.

The mere fact that a *committee* has toyed with the giving of that instruction does not mount to the level of judicial approval—*not even if there were two members of this Court chairing the committee.* It is not doubted that ten, twenty, or even a hundred committees of magistrates, district judges, and barristers could be formed and condemn it. Substantial factor, however, is not seen as an unfair instruction in a proper case where there are at least *two* contributing negligent acts or omissions. In this case there is but one. Mr. Hilden's excessive weight is a fact, but it does not amount to an act and, more assuredly, not an act of negligence. As a matter of fact he had undergone gastric stapling in order to curb or decrease his weight.

I suggest to my brethren the reading of Professor Joseph H. King's comparatively short and easily read article in the 1980–1981 Yale Law Journal, 1353–1396. At page 1356 he informs us that in states, and in cases, where the "but for" instruction has been heretofore given, it is being replaced by the "substantial factor" instruction.

## PART V

It is now in order to see how hay much capable defense counsel was able to make by capitalizing on the instruction given by the district court *sua sponte.* In his summation to the jury, defense counsel explained to the jury how easy it would be to reach a verdict—a verdict favorable to Dr. Ball:

> We are dealing with a malpractice case. What plaintiffs have said and what they would prove and what the law says they must prove is my client committed malpractice. The words in the instructions you're going to see is standard of care. You have probably never heard of that. It's an objective means by which we can judge someone's behavior. That is the only way we can do that and that is why the law sets that standard. And you have got to determine did he meet that standard? And if he didn't you should so find. But if he did, if he met that standard, then you have got to find in his favor.
>
> Now, one of these instructions talks about preponderance of the evidence. The plaintiff told you and the Court has instructed you that the plaintiff has to prove his case. As the Court told you initially in this case, anybody can file a lawsuit. Defendant has come down here and defended it. You have to decide if they can prove it. You have to decide if somebody did something wrong, and you have to decide if what he did caused this man's death. And you'll read that. It says you must be persuaded considering all of the evidence in this case that the proposition on which the party has the burden of proof is more probably true than not. That is what the plaintiff has to do.
>
> . . . .
>
> They said one thing. They said Doctor Ball should have preoxygenated this patient, and because he didn't, this patient died. And that is it. That is what they said. Now, in this case, you're going to have to answer questions about did the doctor or was he negligent, and you determine that the instruction says, by determining if he fell below the standard of care. If he didn't, then he didn't breach that care. Now, the second part of that, you have to find is *proximate cause.* That is a legal term and it is kind of a funny term, but it *means this:* That the plaintiffs—*Mr. Hilden's death in the case would not have occurred but for the act or omission of the defendant and that act or omission is a substantial factor. If the death would have resulted regardless of preoxygenation, then whatever Doctor Ball did, isn't the proximate cause.*
>
> . . . .
>
> Ladies and gentlemen, on your verdict form, you have to write right down the answer to a question. I'm going to read it to you. Was the defendant, Doctor James Ball, negligent which negligence was the proximate cause of the death of Robert Hilden. You have to answer two things in one question. That the negligence relates to the standard of care.

Did he fail to properly care for this patient, and did that failure cause the death. *Now, read that proximate cause instruction very carefully.* Because *what it says is, that for an admission* (sic, act or omission) *by the defendant to be the proximate cause you must find plaintiff's damages, death in this case, would not have occurred but for that act or omission and such act or omission was a substantial factor,* not the general anesthetic, not the drugs that were given, it was the failure to preoxygenate. That is it. That is the issue. Was that negligence? And did that cause his death. That is the question.

Defense counsel full well realized what doors of argument were being opened for him when the district judge stated that he was going to give the jury the "but for" instruction which he had discovered in the *Challis* and *Crosby* cases. That instruction was inappropriate for the scenario which this case presented. Defense counsel had every right to make the most of it. In fact, in my view he was obligated to his client to do so, and, in doing so he undertook to tell the jury nothing which was not within the ambit of the instruction's language. Bob Hilden was dead, make no mistake about that. The fault in the "but for" instruction was in telling the jurors that they could not find causal fault on the part of the defendant unless the widow and children could prove that but for Dr. Ball's acts or omissions, Bob Hilden would not be dead. That would be to prove a negative.

The law which should have been given, and which was always been given in such circumstances, is whether the jury found Dr. Ball's acts or omissions to be a substantial contributing factor. Contrary to the law, defense counsel, because of the instruction—as he read it to the jurors— was able to say and did say of the critical element of probable cause, "If the death would have resulted regardless of preoxygenation, then WHATEVER DR. BALL DID, isn't *the* proximate case."

While it may not have been *the* proximate cause, any fair-minded person on an open-minded reading of the testimony, has little trouble in readily seeing that "whatever Dr. Ball did [or didn't]" do was a substantial contributing factor.

## OPINION ON REHEARING

BAKES, Chief Justice.

This Court granted plaintiff appellant Hilden's petition for rehearing which raised only one issue, *i.e.,* the correctness of the conclusion in our original opinion that the trial court did not err by giving Instruction No. 4 on proximate cause. As our original opinion pointed out, that instruction was based on IDJI 230, and defined proximate cause as "an act or omission by a defendant" which caused the plaintiff's damages, and which damages "would not have occurred *but for* that act or omission, and that such act or omission was a substantial factor in causing the damages." (Emphasis added.) In its brief in support of its petition for rehearing, appellant acknowledges that the "but for" language in Instruction No. 4 is taken from IDJI 230 and is a correct definition of proximate cause in the usual case. However, appellant argues that there is an exception to the general rule of "but for" proximate causation which applies in cases in which there are multiple "forces" or causes, all of which are a substantial factor in bringing about the death of the plaintiff, but some of which are not attributable to the defendant. Appellant argues that in such multiple cause cases the "but for" language of Instruction No. 4 (and IDJI Instruction 230) is an incorrect instruction. Appellant relies primarily upon the Restatement (Second) of Torts, § 432(2), and the case of *Wilson v. City of Kotzebue,* 627 P.2d 623 (Alaska 1981).

The Restatement (Second) of Torts, § 432(2) states:

(2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.

Hilden then cites and quotes the Alaska case of *Wilson v. City of Kotzebue*, which stated:

> As we stated in [*State v.*] *Abbott*, [498 P.2d 712 (Alaska 1972),] the "but for" test is inapplicable when there are two (or more) forces, *and* each one by itself is sufficient to cause the injury. *Id.* at 727. In such cases, the "but for" test does not work because it would result in each force being absolved of liability. *See* Restatement (Second) of Torts § 432, Illustrations 3 and 4 at 431–32 (1965).

627 P.2d at 630. The Alaska court in *Wilson v. Kotzebue* relied on their earlier case of *State v. Abbott*, 498 P.2d 712 (Alaska 1972), which explained:

> Normally, in order to satisfy the substantial factor test it must be shown *both* that the accident would not have happened "but for" the defendant's negligence and that the negligent act was so important in bringing about the injury that reasonable men would regard it as a cause and attach responsibility to it. There is, however, one significant exception to this concurrence requirement: if two forces are operating to cause the injury, one because of defendant's negligence and the other not, and each force by itself is sufficient to cause the injury, then the defendant's negligence may be found to be a substantial factor in bringing about the harm.

498 P.2d at 727 (emphasis in original). Based upon the foregoing authorities, appellant argues on rehearing that because this case involves multiple "forces" or causes of death, not all of which were attributable to the defendant Dr. Ball, the trial court erred in including the "but for" language of IDJI 230 in the proximate cause Instruction No. 4.

In denying Hilden's motion for new trial on this same issue, the trial court relied on the recent Idaho Court of Appeals case, *Challis Irrigation Company v. State*, 107 Idaho 338, 689 P.2d 230 (Ct.App.1984), which analyzed the prior decisions of this Court regarding the law of proximate cause, explaining:

> The concept of proximate cause contains two components—cause in fact, and scope of legal responsibility.[1] W. PROSSER, HANDBOOK OF THE LAW OF TORTS §§ 41–42 (4th ed. 1971). Here, our focus is upon cause in fact.
>
> Proximate cause, in the sense of cause in fact, has been defined as a cause "which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result which would not have occurred." *Smith v. Sharp*, 82 Idaho 420, 426, 354 P.2d 172, 175 (1960). *See also Chatterton v. Pocatello Post*, 70 Idaho 480, 223 P.2d 389 (1950); *Pilmer v. Boise Traction Co.*, 14 Idaho 327, 94 P. 432 (1908). This component of proximate cause embraces two closely related elements. First, an event is the cause in fact of a succeeding event only if the succeeding event would not have occurred "but for" the prior event. Thus, an act or omission is not the cause in fact of ensuing damage if the damage likely would have occurred anyway. The second element is a requirement that the first event be a "substantial factor" in producing the succeeding event. *Munson v. State Department of Highways*, 96 Idaho 529, 531 P.2d 1174 (1975).

---

1. This second half of the two part definition of "proximate cause" has been described by Prosser & Keeton as having very little to do with factual causation.

   Unlike the fact of causation, with which it is often hopelessly confused, this ["scope of legal responsibility"] is primarily a problem of law. It is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible. But both significance and importance turn upon conclusions in terms of legal policy, so that they depend essentially on whether the policy of law will extend the responsibility for the conduct to the consequences which have in fact occurred. Quite often this has been stated, and properly so, as an issue of whether the defendant is under any duty to the plaintiff, or whether the duty includes protection against such consequences. This is not a question of causation, or even a question of fact, but far removed from both; and the attempt to deal with it in such terms has led and can lead to utter confusion.

   PROSSER AND KEETON ON TORTS § 42, (5th ed. 1984).

Thus, a defendant's conduct is the cause in fact of an event only if it was a material element and a substantial factor in bringing it about. W. PROSSER, *supra*, at 240; RESTATEMENT (SECOND) OF TORTS § 431 (1965). 107 Idaho at 343, 689 P.2d at 692.

At the jury instruction conference the trial court evaluated the plaintiff's case, and the nature of the plaintiff's claims, in order to properly choose the instructions to be given to the jury. At that time the trial court proposed a proximate cause instruction composed in the first paragraph of Plaintiff's Requested Instruction No. 4, and in the second half the causation language from IDJI 230, which is the standard proximate cause instruction. That language includes the "but for" phrase of which appellant now complains; however, appellant did not voice any objection to that language at the instruction conference.

Appellant now contends that the trial court should have recognized that plaintiff's claim against Dr. Ball alleged that there were multiple "forces" or causes which caused Mr. Hilden's death, not just a single cause, and therefore the court should have followed the decision of the Alaska Supreme Court in *Wilson v. City of Kotzebue, supra,* and not given the "but for" instruction. However, even assuming that the "but for" causation language of IDJI 230 is inappropriate in a multiple "force" or cause case, after reviewing the record of the trial proceedings up to the date of the instruction conference, and giving deference to the trial judge who presided over all the proceedings,[2] we cannot conclude that the trial court erred in viewing this as a single "force" or cause case, and therefore there is no basis for the appellant's claim. First, there was only a

single defendant, Dr. Ball, on trial for negligence, and no other doctor or health care provider was mentioned in any of the evidence as having been guilty of negligence which caused or contributed to the death of Mr. Hilden. There was no request that any other health care providers be placed on the special jury verdict form. If the negligence of any other doctors or hospital personnel had been a "force" or cause of the death of Mr. Hilden, then their negligence would have been evaluated by the jury even though they had not been made parties to the action. *Lasselle v. Special Products Co.,* 106 Idaho 170, 677 P.2d 483 (1983) ("As stated in *Pocatello Industrial Park Co.* [*v. Steel West, Inc.,* 101 Idaho 783, 621 P.2d 399] (1980) the reason for the rule is that 'true apportionment cannot be achieved unless · that apportionment includes all tortfeasors guilty of causal negligence either causing ·or contributing to the occurrence in question, whether or not they are parties to the case.' "). The entire thrust of plaintiff's case was that it was solely the defendant Dr. Ball who breached the local community standard of care by failing to pre-oxygenate Mr. Hilden before inducing anesthesia, which breach was the proximate cause of the death of Mr. Hilden.

Plaintiffs' case was based upon the testimony of their expert medical witness Dr. Elthrington, who testified that the cause of Mr. Hilden's cardiac arrest and subsequent death was the failure of Dr. Ball to pre-oxygenate the patient. Dr. Elthrington said:

> I think if that patient had been pre-oxygenated from the very beginning of the injections of drugs and allowed that reserve [of oxygen], I think this patient might well have been resuscitated.
>
> . . . .

---

**2.** We acknowledge the preeminent position of a trial judge in ·evaluating such claims. The trial judge presides over all of the proceedings in the trial court, from the beginning where the issues are formulated by pleadings, discovery, pretrial and trial conferences, to the trial where the parties submit evidence to prove their case, and finally the instruction conference with the attorneys and the final arguments to the jury. Because of his participation at each stage of the trial proceedings, the trial judge is in a better position to evaluate the nature of the plaintiff's claims than is a court on appeal judging the proceedings in hindsight from a cold record. Particularly, with regard to the evaluation of the evidence in support of the plaintiff's claim, the trial court is in a unique position to evaluate how that evidence relates to the claims then being made by the litigants. Accordingly, we give substantial deference to the trial court's evaluation of the issues which result in the court's instructions to the jury.

I'll go one step further, my patient in my opinion would not have arrested in the first place.

When asked what difference the absence of pre-oxygenation would have made in this case, Dr. Elthrington responded, "I think it made the difference between the patient dying and having a good chance of being resuscitated." At the conclusion of his testimony, Dr. Elthrington stated:

[I]n my opinion the heart stopped beating because the heart did not have enough oxygen because the patient had no reserves to begin with and those reserves he did have were utilized during the time it took to get air into lungs, and by that time the patient's heart had died.

The defendant, on the other hand, produced expert medical testimony denying that Dr. Ball had breached the local standard of care by failing to pre-oxygenate the patient Mr. Hilden. In response to the question, "Do you have an opinion as to a reasonable degree of medical certainty whether or not the fact that you did not give oxygen prior to induction caused Robert Hilden's death," Dr. Ball testified:

Well, I do not believe that preoxygenation would be significant in this case, because post intubation and actually even post Anectine or anything I was still unable to move air of any quantity worth mentioning. However, had the air been able or oxygen been able to be moved in and out with the bag, then there would have been no problem. And I don't believe that extra oxygen in the beginning would have altered that at all. The fact that not only immediately post induction, but throughout the next almost well 45 minutes it was still impossible to adequately move air in and out.

The defendant also produced Dr. Klipperdt, an anesthesiologist, who rendered an expert opinion, to a reasonable degree of medical certainty, that the defendant Dr. Ball did not necessarily breach the local standard of care in Burley, Idaho, by failing to preoxygenate this patient. Dr. Klipperdt testified that he did not preoxygenate all of his patients, stating:

The vast majority [that] I do preoxygenate are those who have emergency surgery because they are suspected of having a full stomach having eaten recently and the emergency need to do surgery eliminates the opportunity to allow time to pass for their stomach to empty prior to the surgery. So to summarize if I believe they have food still in their stomach from having eaten recently and there is not enough time for that to digest and pass through the orifice and it's not likely that it will pass in a given time ... we'll proceed with preoxygenation in the emergency.

Q. In the obese people that you have put under a general anesthetic, are they all preoxygenated?

A. No they are not.

The plaintiffs did not produce evidence of other multiple "forces" or causes which were themselves sufficient to bring about the death of Mr. Hilden, and which were not related to any act or omission on the part of Dr. Ball. Nor did appellant's trial counsel argue, either in opening or closing arguments, that there were multiple causes for Mr. Hilden's death, not all of which were attributable to the defendant Dr. Ball. Rather, Hilden's counsel asserted, both in opening and closing arguments, that the cause of Hilden's death was the negligent failure of Dr. Ball to pre-oxygenate Hilden prior to administering general anesthesia and, as a result, Hilden had no oxygen reserve to sustain his heart until his breathing could be supported artificially.

In opening, Hilden's counsel argued:

[The defendant may] disagree with the conclusion, and that conclusion being well, it was acceptable care for Doctor Ball to do things the way he did. [A]nd the proof is going to show that it is never acceptable care not to be prepared for something you know might happen. And it's never acceptable care to take a gentleman and deprive him of his ability to breathe normally and not take care of his oxygen needs. And consequently you're going to come to two conclusions, that the care given to this gentleman was substandard and that is why he died.

In closing argument, Hilden's counsel again asserted that by not pre-oxygenating Mr. Hilden the patient was deprived of the oxygen reserves necessary to carry him through the period when he could not breathe for himself and before the intubation and artificial breathing was commenced.

> The problem goes to that reserve. The reserve level is so low he couldn't handle hardly any amount of time without oxygen.
>
> . . . .
>
> We don't back off from the fact that the preoperative period is the key. The use of the reserve of the oxygen preoperatively is the key. It's not just you are saying I should pre[-]oxygenate everybody[.] We are saying that in this circumstance an individual with compromised ventilation deserved a fighting chance.

Dr. Ball's counsel, in his closing argument, acknowledged the singleness of appellant's claims:

> Now, the plaintiff has said one thing, and one thing only. The plaintiff hasn't said that general anesthesia was a bad idea. They haven't said that. They agree with that. They agree that general anesthetic was the way to go in this case. They didn't say the drugs were improper. Doctor Elthrington testified they were used all the time. They have been used on millions of patients and they still are today. They don't complain about that. They don't complain that Doctor Ball got the tube in the trachea. Doctor Elthrington said that is where it was. They don't say the dosage of the drugs are bad. They said one thing. They said Doctor Ball should have pre-oxygenated this patient, and because he didn't, this patient died. And that is it. That is what they said.

At the jury instruction conference appellant did not advise the trial court, as they now assert in this Court, that they were contending that there were multiple "forces" or causes of Mr. Hilden's death, not all of which were attributable to the negligence of the defendant Dr. Ball, and that therefore the standard IDJI No. 230, with its "but for" language, was inappropriate in this case. Although appellants did routinely "object to all of the instructions that were not proposed by us," [3] appellant's counsel did not apprise the trial court at the jury instruction conference of the claim it is now making on appeal or even mention the proximate cause instruction. Accordingly, the trial court was left to evaluate plaintiff's case based solely upon its analysis of the evidence admitted at trial, and the claims then being made. Based upon that record, which attempted to place the cause of death solely on Dr. Ball for failure to pre-oxygenate the patient, the trial court understandably chose the standard IDJI Instruction No. 230 as the correct instruction to be given in this case.

The Alaska case relied upon by the appellant, *Wilson v. City of Kotzebue*, 627 P.2d 623 (Alaska 1981), does not support appellant's position. The Alaska court in *Wilson* refused on appeal to subdivide an essentially single-cause case into various multiple "forces" or causes for purposes of determining whether a "but for" type proximate cause instruction should have been given. The court in the *Wilson* case upheld the giving of a "but for" type proximate cause instruction, stating, "Under Wilson's theory of the case, but for the city's various acts of negligence either there would have been no fire or he would not have been injured by it, or his injuries would not have been so severe." The Alaska court then held that even though there were various acts of negligence alleged to have been committed by the city, there was only a single "force" or cause of the plaintiff's injury, *i.e.*, the defendant city's negligence, and therefore a "but for" type proximate cause instruction was the proper instruction. "The exception which we referred to in *Abbott* does not apply." "This

---

**3.** As pointed out in our original opinion, the first part of Instruction No. 4 was plaintiff's requested instruction.

is not such a [multiple cause] case." 627 P.2d at 630.

Based upon the allegations and the evidence before the trial court, and the statements of counsel, or the lack thereof at the instruction conference, we conclude that the trial court did not err in choosing to instruct the jury using the standard IDJI 230 instruction defining proximate cause.

Accordingly, we adhere to the views expressed in our original opinion.

JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, dissenting.

Mention need be made of this Court's opinion in *State Tax Commission v. Railbox Co.*, 116 Idaho 909, 782 P.2d 32 (1989). The Court's opinion stated: "We note at the outset that the Tax Commission has submitted no authority for the proposition that it may disregard its own regulation." 116 Idaho at 910, 782 P.2d at 33. In its petition for rehearing, the Tax Commission challenged the validity of that statement. The challenge was well-taken. The Tax Commission's initial brief had cited *K-Mart Corp. v. Idaho State Tax Com'n.*, 111 Idaho 719, 727 P.2d 1147 (1986), and relied heavily upon that case. On the critical point involved in *Railbox*, the cases were on a par. Railbox's supporting brief pointed to the Court's error—not just error, but a bold misstatement concerning which fourteen pages were written on denial of petition for rehearing—all to no avail. Beyond understanding is how the Court could see no need to face up to its two unjustifiable mistakes. The first was, of course, in declaring that the Idaho Tax Commission had failed to cite any authority. Second and even worse was, on having its attention called to its first misstatement, its reaction was to bury its collective head in the sand like the proverbial ostrich, which was done by summarily denying a rehearing.

All of which has nothing in particular to do with the court's rebuff dealt to the widow and children of Bob Hilden in their attempt to gain redress for his wrongful death. In general, however, it does have to do with letting them know that in the *Railbox* case the Court, on being caught in error as great as in Hilden's case, gave shorter shrift indeed to a petition for rehearing. The Hilden heirs were awarded a rehearing. The minutes of the clerk of the court will reflect that the necessary two votes were cast by Justice Huntley and Justice Bistline. The rehearing has been had. The Court's nine page opinion, to which this dissenting view is appended, gives some indication that counsel for the Hilden plaintiffs at least caught the Court's attention on the rehearing.

This second majority opinion clears up the impression (left by the first opinion), that the plaintiffs were guilty of requesting Instruction No. 4, the instruction which obviously deprived them of any chance of recovery. As my earlier opinion shows, and the now changed majority opinion confirms, plaintiffs were not responsible for the erroneously damaging language in Instruction No. 4. The plaintiffs had requested only the first paragraph, which was:

> When I use the expression 'proximate cause,' I mean a cause which, in natural or probable sequence, produced the damage complained of. It need not be the only cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes damages.

The majority's failure to earlier comprehend that only this much of Instruction No. 4 was asked for by plaintiffs undoubtedly has flavored the majority's thinking in both of its opinions. The instruction as requested by the plaintiffs was not invented for the Hilden–Ball controversy, but rather comes of good ancestry, and is a time-tested instruction. Under fire still, and probably forevermore, is the district court's addition of the "but for" second paragraph to Instruction No. 4.:[4]

---

4. Perusal of the clerk's record shows that the defendant did not request any instruction on proximate cause. The "but for" clause was not attributable to the defendant. When plaintiffs filed their post-judgment motions, the defendants filed objection thereto and offered a de-

For an act or omission by a defendant to be a proximate cause of a plaintiff's damages, you must find that the plaintiff's damages would not have occurred *but for* that act or omission, and that such act or omission was a substantial factor in causing the damages.

An act or omission is not a proximate cause of a plaintiff's damages if the damages would have occurred without such act or omission.

(Emphasis added.)

As was pointed out in my exhaustive dissent submitted earlier, the author of the majority opinion selectively avoided making any analysis of the district court's opinion, rather choosing to write as though there was not one available. The dissent pointed to the district court's review:

> The district court in making its *Quick* review was careful to note *plaintiffs' contention that the 'but for' test contained in the second paragraph was not appropriate.* The district court defended the giving of this instruction by asserting that '[t]he Idaho Supreme Court has recently defined "proximate cause," ' *Challis Irrigation Co. v. State*, 107 Idaho 338, 343, 689 P.2d 230, 235 (Ct.App. 1984), and then quoted the excerpt from *Challis* upon which reliance was placed:
>
>> The concept of proximate cause contains two components—cause in fact, and scope of legal responsibility. (Citation omitted.) . . .
>>
>> Proximate cause, in the sense of cause in fact, has been defined as a cause "which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred." (Citations omitted.) This component of proximate cause embraces two closely related elements.

First, an event is the cause in fact of a succeeding event only if the succeeding event would not have occurred *"but for"* the prior event. Thus, *an act or omission is not the cause in fact of ensuing damage if the damage likely would have occurred anyway.* The second element is a requirement that the first event be a "substantial factor" in producing the succeeding event. (Citation omitted.) Thus, a defendant's conduct is the cause in fact of an event only if it was a material element and a substantial factor in bringing it about. (Citation omitted.) R. 208 (emphasis added). The district court went on to note that the 'same language has recently been used in *Crosby v. Roward Machinery Co.*, 111 Idaho 939, 729 P.2d 414 (1986).' Here the district court was somewhat in error. That language does appear in the *Crosby* opinion. The district court's citation to that case leaves the impression that it, too, was an opinion from the Supreme Court. However, the *Challis* and the *Crosby* opinions were both from the Court of Appeals. More aptly put, the Idaho Supreme Court was not responsible for either the *Challis* opinion or the *Crosby* opinion. [Nor was it responsible for a third 'but for' sequel case where same instruction was involved, *Edmark Motors v. Twin Cities Toyota, Inc.*, 111 Idaho 846, 727 P.2d 1274 (Ct.App.1987).]

Based upon the language found in *Challis* and *Crosby*, the district court reasoned that:

> *The fact that the* plaintiff has the burden of proving that a *defendant's negligence was a substantial factor in causing damage* to the plaintiff *does not excuse the plaintiff from proving that the injury would not have oc-*

---

fense for the court's giving of the "but for" instruction: "Likewise, Instruction No. 4 is a proper statement of the law in Idaho concerning proximate cause, and the Court did not err in providing the jury with that instruction." R., 214. Defendant did submit a special verdict form which gave clear recognition to the issue being whether defendant was negligent and whether that negligence was *a* proximate cause

of Robert Hilden's death. It also provides for apportioning percentages of fault to the doctor and to Hilden. The defendant's special verdict form is attached as Appendix A. As this dissent discusses, exactly how Hilden was in any way the cause of his own death will forever remain one of the great unsolved mysteries of the world.

curred "but for" the defendant's negligence. Instruction No. 4 is also consistent with revised IDJI 230 (Rev. 7/87). The plaintiffs presented evidence that Dr. Ball's failure to preoxygenate was *the actual cause* of Mr. Hilden's death, *but Dr. Ball presented evidence that Mr. Hilden would have died anyway.* Thus, it was necessary for the jury to be instructed *on all aspects of proximate cause,* including the so-called "but for" portion of the instruction.

R. 208 (emphasis added). Here the district court erred in equating 'a proximate cause' as the equivalent of 'the actual cause.' The court also relied on § 431 of the Restatement of Torts:

> Sec. 431 defines legal cause. It states, "The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, . . . ." The Comment immediately following Sec. 431 states:
>
>> In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent. . . . (T)his is necessary, but it is not of itself sufficient. The negligence must also be a substantial factor in bringing about the plaintiff's harm.

Restatement (Second) of Torts, Comment at p. 429.

R. 207. There is not, and should not be, any problem with the 'substantial factor' portion of the instruction. Substantial connotes a degree of more than trivial or slight.

> If it had been established conclusively that Mr. Hilden was going to die that day, irrespective of the failure to preoxygenate, then the district court's analysis was sound, and nothing remained for Justice Bakes to attend to; it would be sufficient *to set out the district court's opinion and affirm it.*

117 Idaho at 319, 787 P.2d at 1127 (emphasis in original and added; footnote omitted).

In a footnote to this part of the dissent, it is stated:

> There is no contention and also no testimony or evidence of any kind whatever that Mr. Hilden was dying, ill, or *in extremis.* It was not an emergency situation, but an operation where the surgeon and Dr. Ball had fully collaborated in advance as to the details. *No witness testified that Mr. Hilden would have died that day irrespective of whether he had been preoxygenated. Justice Bakes,* only by not deigning to address the district court's opinion, *has thus far been able to avoid coming face to face with the district court's assertion that Dr. Ball presented evidence that Mr. Hilden would have died anyway.*

*Id.,* at 319, 787 P.2d at 1127 (emphasis in original and added).

In today's opinion Chief Justice Bakes has now written at greater length than in the first majority opinion, and may or may not be continuing to adhere to the earlier holding against the plaintiffs because he now writes in a different vein, *i.e.,* that they "did not voice any objection to that [but for] language at the instruction conference." Majority Opinion on Rehearing, 117 Idaho at 335, 787 P.2d at 1143. In the earlier opinion he was less specific when he wrote: "[a]ppellants generally objected to all jury instructions which they did not propose; however, they did not give the trial court an opportunity to correct potential errors by stating specific reasons for objecting to the given proximate cause instruction." *Id.,* 117 Idaho at 317, 787 P.2d at 1125. Either way, if that be an inexplicit basis for not awarding the plaintiffs a second trial free of such error, I will recommend to the four judges comprising the majority the fairly recent case of *Country Insurance Company v. Agricultural Development, Inc.,* 107 Idaho 961, 695 P.2d 346 (1985), where this Court painstakingly tracked through the plethora of amendments to Rule 51(a)(1) and discovered the amendment made July 2, 1976, *all of which, for facility of viewing is collected in Appendix B attached hereto. See* 107 Idaho at 963, 695 P.2d at 348, with special attention directed to footnote 2.

In today's opinion for the Court, Chief Justice Bakes assumes that the "but for" causation language is inappropriate in a multiple cause case, but by "giving deference[5] to the trial judge who presided ... we cannot conclude that the trial court erred...." 117 Idaho at 320, 787 P.2d at 1128. All trial judges are entitled to deference simply because they *are* trial judges. My opinion now is and has been that this particular trial judge is one of the finest, but I will not be the second to say that any judge is not beyond committing error. Nothing would be more gratifying to me, and certainly to the plaintiffs as well, than that the six justices who have joined Chief Justice Bakes on now two occasions would also join him again in an opinion which at the least allows Judge Granata to reconsider his ruling, as we just did this past week in *Heitz v. Carroll,* 117 Idaho 373, 788 P.2d 188 (1990), or better yet, ask him to preside over a second trial, which to my mind was the better course of action suggested in our *Heitz* opinions.

But returning to deference, after which point I will shortly close, it just might bring about a change of two votes to remind the other members of the Court that the district judge, of a necessity, had to have been aware of *two* causes for Robert Hilden's wholly unexpected, sudden and tragic demise. Otherwise, how could Judge Granata have written, as he most definitely did in denying plaintiff's motion for j.n.o.v. and for new trial:

The fact that the plaintiff has the burden of proving that a defendant's negligence was a substantial factor in causing damage to the plaintiff does not excuse the plaintiff from proving that the injury [death] would not have occurred "but for" the defendant's negligence. Instruction No. 4 is also consistent with

revised IDJI 230 (Rev. 7/87). The plaintiffs presented evidence that Dr. Ball's failure to preoxygenate was *the actual cause* of Mr. Hilden's death, *but Dr. Ball presented evidence that Mr. Hilden would have died anyway. Thus, it was necessary for the jury to be instructed on all aspects of proximate cause, including the so-called "but for" portion of the instruction.*

R. 208 (emphasis added; footnote omitted). The jury was in that manner directed to find for Dr. Ball unless it could find from the evidence that, notwithstanding the proof of causative negligence on the part of Dr. Ball, the plaintiff also had to prove a negative, namely, that Hilden would not have died anyway. This is an absurdity. This is especially so when not one of four experienced justices can find any support for Judge Granata's statement that Hilden was going to die anyway. This case and Instruction No. 4 may well stand as the most outstanding tragic travesty in the annals of Idaho civil jurisprudence.

Where the district court has ruled that the defense presented evidence that *Robert Hilden would have died anyway,* which can only mean that he would have expired even had he been preoxygenated, there necessarily had to exist in the trial court's mind another cause, a second contributing cause. Those in the majority have expressed no concern as to this second cause. Hilden had not checked in to a mortuary with the purpose in mind of dying. He did not know he was going to die. The surgeon who was present and about to do surgery on him had not yet laid a knife on Hilden. But, he did die. The only evidence in the record is that it was a routine operation, that Hilden was overweight (which appears to have been for him a near normal condition),[6] and that by reason thereof the

---

**5.** In footnote 2 to the majority opinion, deference is increased to *substantial* deference. How such deference is accorded to the giving of instructions of law may escape practitioners even as it escapes me. Instructions are either correct statements of law, or they are not. They are either applicable to the evidentiary facts and theories of the parties, or they are not.

**6.** The defendants admitted that:

Additionally, Plaintiff contends that Mr. Hilden posed an unusually high risk because of his size and shortness of breath. It was never established by Plaintiff or Defendant that he posed an unusually high risk, but in any event, the testimony of Dr. Ball and the Records reflect that he took an inordinate amount of time and caution in assessing the patient and preparing him for surgery. R., 213.

two physicians had agreed upon positioning him so that he would suffer less discomfort.

Somewhere in the record there must be this *other* cause (or "force" as so termed by Chief Justice Bakes)—*and something in the evidence presented by Dr. Ball* pointed to it. If there is no such other cause to which the district court can point, and his opinion pointed to none, then it stands to reason that there is no support for the assertion that Hilden would have died anyway. Under these circumstances it would be a happy day for the science of Idaho jurisprudence if the plaintiffs were granted the new trial which they are clearly entitled to have. I would be the first to recommend that it be tried with the same judge presiding. Simply stated, the trial judge's reading brought him into contact with the "but for" instruction which the Court of Appeals initiated, and the trial judge thought it fit the facts of this case as is evident from his own opinion. There is no guarantee that mistakes will not be made. My confidence in the district judge is such that I find it shameful that he is not given the opportunity to rule again on plaintiff's motion.

## APPENDIX A

[Case caption appears here.]

### SPECIAL VERDICT

We, the jury, answer the questions submitted to us in the Special Verdict as follows:

QUESTION NO. 1: Did the Defendant Dr. James Ball negligently fail to meet the applicable standard of health care practice of the community in which such care was provided to Plaintiff's decedent, Robert Hilden, as such standard existed at the time such care was provided, with respect to the class of health care provider to which Dr. James Ball belonged and in which he was functioning, and was such breach a proximate cause of the death of Robert Hilden?

YES___   NO___

QUESTION NO. 2: Was there negligence on the part of Plaintiff's decedent, Robert Hilden, which negligence was a proximate cause of his death?

YES___   NO___

QUESTION NO. 3: Considering all of the fault of the parties which proximately caused or contributed to the death of Robert Hilden to be one hundred percent (100%), what percentage is attributable to:

(a) Decedent Robert Hilden   _____%
(b) Defendant Dr. James Ball _____%
             TOTAL        100  %

QUESTION NO. 4: What are the total damages sustained by Plaintiff?

$_____

[Signature lines for twelve jurors appear here.]

Defendant Dr. James Ball's
Proposed Special Verdicts
And Requested Instructions
R., 82–83.

## APPENDIX B

The respondent's brief in *Country Ins. Co.* was the backbone of the Court's opinion, which quote narrates the up and down history of I.R.C.P. 51, and the story started with *Archer v. Shields Lumber Co.*, 91 Idaho 861, 434 P.2d 79 (1967), at which time it was true that:

> The failure to object to any instruction given by the court shall not preclude any party to the action from assigning as error on appeal any erroneous instruction given, not requested by such party, or any omission by the court to give a proper instruction.... (Emphasis added.)

*Country Ins. Co. v. Agr. Develop., Inc.*, 107 Idaho 961, 962, 695 P.2d 346, 347 (1985) (emphasis in original). It was amended in 1975:

> [T]he prior provision: 'The failure to object to any instruction given by the Court shall not preclude any party to the action from assigning as error on appeal any erroneous instruction given or any omis-

sion by the court to give the proper instruction,' was stricken and a mandatory requirement was added that counsel must object to the instructions that will be given by the Court and the failure to make an objection on the record precludes raising the issue on appeal.

*Id.* at 962, 695 P.2d 346. In 1976 the rule was again amended:

[B]y order dated July 2, 1976, effective October 1, 1976[,] [t]hat 1976 amendment completely removed the sentence which is set out in footnote 2 [see below]. A further amendment made to the rule on May 25, 1977, ... did not reinstate the language deleted by the 1976 amendment, but' only continued the requirement of instruction conferences, and changed the existing last sentence of I.R. C.P. 51(a) to read that 'All objections thereto, and any objections to the giving or the failure to give an instruction, and any court's ruling thereon, must be made a part of the record.' Insofar as the argument here is concerned, *the rule for almost eight years has not required the making of objections as a condition precedent to assigning error.*

*Id.* at 963, 695 P.2d 346. The 1975 amendment had placed in the rule this mandatory language:

No party may assign as error the giving or the failure to give an instruction unless [the party] objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which [the party] objects and the grounds of [the] objection.

*Id.* at 963, n. 2, 695 P.2d 346.